**Mark P. SCHLEFER, Appellant,**

v.

**UNITED STATES of America, et al.**

**No. 82–1635.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 11, 1983.

Decided March 1, 1983.

As Amended March 1, 1983.

Mark P. Schlefer, pro se. Vicki J. Shteir and Donald M. Squires, Washington, D.C., were on brief for appellant.

David H. Enzel, Sp. Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Royce C. Lamberth, R. Craig Lawrence, and John D. Bates, Asst. U.S. Attys., Washington, D.C., were on brief for appellees.

Before ROBINSON, Chief Judge, Mac-KINNON and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

The Office of the Chief Counsel of the Maritime Administration maintains summary-indexes of significant written opinions prepared by the Chief Counsel [1] in response to intra-agency requests for legal advice. Many of the indexed "Chief Counsel Opinions" ("CCOs") interpret statutes relevant to the Agency's dealings with the public; others address questions of Agency policy, or deal with internal Agency activities. Invoking the Freedom of Information Act (FOIA), 5 U.S.C. § 552, plaintiff-appellant Schlefer seeks release of index digests of CCOs that interpret provisions of three statutes assigning prime responsibilities to the Agency: the 1916 Shipping Act, and the 1920 and 1936 Merchant Marine Acts, as amended. The Agency describes these documents as deliberative, predecisional, and within the scope of the attorney-client privilege; it therefore claims that the indexes are shielded by FOIA Exemption 5. In large part, the district court upheld the Exemption 5 plea. For the reasons set forth below, we hold that the Agency has failed to demonstrate that Exemption 5 covers the CCO summary-indexes in question. Accordingly, we reverse the district court's judgment and remand the case with instructions to order disclosure of the requested documents.

## I. BACKGROUND

### A. Description of the Documents

Maritime Administration officials, ruling on requests for loans or subsidies, the use of reserve funds maintained by shippers pursuant to the Marine Acts, and similar matters presented to the Agency by outsiders,

1. The position was formerly designated "General Counsel." For simplicity, we adopt the current title, "Chief Counsel," throughout. Consistent with the current Chief Counsel's own practice, Joint Appendix (J.A.) at 23 n. *, we use his title and that of the Office of the Chief Counsel interchangeably.

may request legal advice from the Chief Counsel.[2] Advice is given in the form of legal memoranda from the Chief Counsel to the "requesting official." A small fraction of these memoranda, considered "important" or "significant," or addressing issues likely to recur, are designated "CCOs" by the Chief Counsel. Joint Appendix (J.A.) 26. Examples of CCOs, accepted by the Agency as "typical of all CCOs," J.A. 29, are set out in the Joint Appendix at 5–13.

Each CCO is transmitted to the requesting official and circulated among the attorneys in the Office of the Chief Counsel, and a copy is bound into the current volume of CCOs maintained by that Office. The Office of the Chief Counsel staff also summarizes the facts and holding of the CCO on one or more index cards, and files these under appropriate headings. J.A. 26–28. Examples of the summary-index cards that Schlefer would have the Agency disclose appear in the Joint Appendix at 43–45.[3] There is no other distribution of CCOs or summary indexes within the Agency, but requesting officers are free to discuss their contents with other Agency officials. J.A. 59.

Though final Agency decisions and public statements are, of course, communicated to affected parties outside the Agency, CCOs themselves generally are not released to the public.[4] A published decision occasionally will refer to the CCO on which it relies, but the text of the CCO is disclosed only in the rare instance when it is explicitly incorporated in the published decision.

**2.** According to the current Chief Counsel:

The legal issues posed by requesting officials and addressed in CCOs have ranged over the entire gamut of responsibilities assigned to the agency under various statutes, the most important being the Merchant Marine Act of 1936, 46 U.S.C. §§ 1101 *et seq.*, the Merchant Marine Act of 1920, 46 U.S.C. §§ 861 *et seq.* and the Shipping Act of 1916, 46 U.S.C. §§ 801 *et seq.*

Dickstein Affidavit, J.A. 25.

**3.** Two summary index cards are reprinted *infra,* notes 15 & 17.

**4.** CCOs were published until the 1950s. J.A. 88.

### B. *The District Court's Decision*

The district court held, on cross-motions for summary judgment,[5] that CCOs (and therefore the CCO summaries Schlefer requested) are part of the predecisional, deliberative Agency process, flowing from "advisor" to "decisionmaker," and prepared before the Agency arrives at its final decision. J.A. 90.[6] The court read the record to show that "[a]gency officials ty[p]ically follow the advice contained in a CCO, but this is not required.... If an official disagrees with a CCO, he may ignore it or may present the Chief Counsel with his reasons for disagreeing with the opinion. The Chief Counsel then may or may not change his opinion." J.A. 87–88. Largely because CCOs are not designated as formally binding on the officials who seek the Chief Counsel's legal advice, the district court ordered the Agency to disclose only those summary-indexes of CCOs that the Agency has "relied upon" in making final decisions. J.A. 93.

The district court further held that the attorney-client privilege does not apply to CCOs "relied upon" by the Agency, J.A. 92, but did not indicate whether the privilege provides an independent basis for protecting other CCOs from disclosure.

### C. *Statutory Background*

Schlefer contends that CCOs are part of the working Agency law, and fall squarely within the language of 5 U.S.C. § 552(a)(2).

**5.** The district court decided this case on the basis of the written record and legal argument, and we are presented with no findings on disputed questions of historic fact. Our review, therefore, is not as deferential as it would be had the district court's decision turned on resolution of a fact controversy. *See* J. Moore & J. Lucas, 5A Moore's Federal Practice ¶ 52.08 at 2734 n. 3 (3d ed. 1982).

**6.** "[CCOs] are predecisional as they flow from an advisor to a decisionmaker and are written before the agency official has made his decision.... CCOs constitute a dialogue between the advisors, the Chief Counsel's Office and the decisionmakers, the agency officials." District Court Opinion, J.A. 90.

That section of FOIA requires disclosure of "statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register; and ... administrative staff manuals and instructions to staff that affect a member of the public ...."

■ The Agency relies on FOIA Exemption 5, which provides that disclosure requirements do not apply to "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency ...." 5 U.S.C. § 552(b)(5). Exemption 5 encompasses "the protections traditionally afforded certain documents pursuant to evidentiary privileges in the civil discovery context," *Taxation With Representation Fund v. IRS,* 646 F.2d 666, 676 (D.C.Cir.1981). It extends to materials used as part of the "deliberative process," *Federal Open Market Committee v. Merrill,* 443 U.S. 340, 353, 99 S.Ct. 2800, 2802, 61 L.Ed.2d 587 (1979); *EPA v. Mink,* 410 U.S. 73, 86–87, 93 S.Ct. 827, 835–836, 35 L.Ed.2d 119 (1973); *Russel v. Department of the Air Force,* 682 F.2d 1045, 1047–48 (D.C.Cir.1982), and materials that ordinarily would be protected by the attorney-client privilege. *Coastal States Gas Corp. v. DOE,* 617 F.2d 854, 862–64 (D.C.Cir.1980); *Mead Data Central, Inc. v. United States Department of the Air Force,* 566 F.2d 242, 252–55 (D.C.Cir.1977).

■ The Agency bears the burden of demonstrating that CCOs are predecisional and deliberative, or that they fall within the attorney-client privilege. 5 U.S.C. § 552(a)(4)(B); *Vaughn v. Rosen,* 523 F.2d 1136, 1144, 1146 (D.C.Cir.1975). Both privileges are to be construed narrowly. *Coastal States, supra,* 516 F.2d at 862, 868.

## II. THE "DELIBERATIVE PROCESS" EXCEPTION

The reasons for shielding "deliberative" agency documents from disclosure were explained in *Coastal States, supra,* as follows:

> The privilege has a number of purposes: it serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action.

617 F.2d at 866 (citation omitted).

■ The disclosure of documents that authoritatively state an agency's position will neither inhibit the free exchange of views within the agency nor confuse the public, because the agency's own purpose in preparing such documents is to obviate the need for further intra-agency deliberation on the matters addressed. But the line between "authoritative" and "deliberative" agency documents, if readily described in abstraction, is often blurred in concrete cases. Courts have used several indicators to gauge which internal agency documents embody agency "law" that must be disclosed, and which represent intra-agency "deliberation" that may be withheld. Two testing questions largely embrace these indicators: first, do the documents serve as "law" in the specific case to which they are addressed; second, do they serve as "law"-like precedent in subsequent cases.

### A. The Authority of a CCO in the Case it Addresses

■ The CCOs to which Schlefer seeks access—those interpreting provisions of the 1916 Shipping Act, and the 1920 and 1936 Merchant Marine Acts—are written and received in circumstances that establish them as definitive rulings on the legal questions they decide. First, a close and complete look at hierarchical relations within the Agency reveals that the Chief Counsel has authority effectively to give the legal advice furnished in CCOs the force of internal Agency law. Second, in practice, requesting officials always follow the advice given.

▓ Intra-agency memoranda from "subordinate" to "superior" on an agency ladder are likely to be more "deliberative" in character than documents emanating from superior to subordinate. *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 155, 95 S.Ct. 1504, 1518, 44 L.Ed.2d 29 (1975); *Renegotiation Board v. Grumman Aircraft Engineering Corp.,* 421 U.S. 168, 184–85 & n. 22, 95 S.Ct. 1491, 1500–01 & n. 22, 44 L.Ed.2d 57 (1975); *Arthur Andersen & Co. v. IRS,* 679 F.2d 254, 259 (D.C.Cir.1982); *Brinton v. Department of State,* 636 F.2d 600, 605 (D.C.Cir. 1980), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981); *Taxation With Representation, supra,* 646 F.2d at 679–81; *Coastal States, supra,* 617 F.2d at 868. The converse is equally true. We therefore turn first to the division of authority between the Chief Counsel and officials who seek advice in construing the three Acts of interest to Schlefer. Our consideration looks beneath formal lines of authority to the reality of the decisionmaking process in question.

Formally, decisionmaking power is delegated from the head of the Maritime Administration to subordinate officials who act as primary decisionmakers.[7] These officials are not required to solicit the Chief Counsel's views before arriving at a decision.[8] If advice is sought, it is ordinarily communicated from the Office of the Chief Counsel to the requesting official, who retains initial decisionmaking authority.[9] But the contention that the Chief Counsel is "wholly without authority to make substantive decisions binding upon the agency," Brief for Appellees at 6, is superficial. Even if correct as a formal matter, the statement is subject to an overriding qualification.

▓ *At the time a CCO is sought,* the requesting official does have decisionmaking authority. With respect to decisions that involve the interpretation of the three Acts of interest to Schlefer, however, the Chief Counsel and requesting officials ultimately occupy a superior-subordinate relationship. When an Agency official makes a decision that interprets any of these three Acts, the decision must subsequently receive legal clearance from the Chief Counsel. The Chief Counsel will not clear action that is inconsistent with a CCO issued earlier to a requesting official.[10] In the end, the Chief Counsel decides questions of statutory interpretation; Agency action that depends on statutory interpretation does not occur without Chief Counsel approval.[11]

---

7. "Although the requesting official may have a lesser rank [within the] agency than the Chief Counsel, ... legal advice is sought by the requesting official in his or her capacity as a decisionmaker exercising authority delegated from the head of the agency or in the course of preparing advisory memoranda or recommendations for such a decisionmaker." Affidavit of current Chief Counsel Dickstein, J.A. 23–24.

8. "The requesting official is not obliged to seek the advice of the Chief Counsel by any agency rule or policy; the decision to seek the advice of the Chief Counsel is entirely within the discretion of the requesting official." *Id.,* J.A. 23.

9. In at least one instance, however, the Chief Counsel communicated his decision directly to the party affected. *See, infra,* p. 241.

10. Conceivably, the Chief Counsel might reconsider the question and decide to overrule the earlier CCO, J.A. 51–52, but the Agency has reported no instance in which this has occurred. In any event, the mere fact that a decisionmaker retains the authority to overrule earlier decisions does not render those decisions "deliberative."

11. While Chief Counsel decisions might be overruled by the head of the Agency, the Agency has provided no evidence that the Chief Counsel is not, in practice, the final decisionmaker in most cases. *In Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.,* 421 U.S. 168, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975), the Supreme Court found that reports prepared by "Regional Renegotiation Boards" and used by the full Board as a basis for discussion in arriving at final decisions, were protected from disclosure under Exemption 5. But the Court was careful to note:

We decline to consider whether this case would be different if the Regional Boards had *de facto* decisional authority—*i.e.,* if, instead of making up its own mind in each case, the Board "reviewed" the Regional Board's recommendation under a clearly erroneous or some other deferential standard; or if the Board failed even to review the vast bulk of the reports, absent special circumstances.

421 U.S. at 185 n. 22, 95 S.Ct. at 1500–01 n. 22. Absent any indication to the contrary from the Agency, we assume that review of CCOs by the head of the Maritime Administration is deferen-

The contours of the Chief Counsel's authority are clearly set out in Maritime Administrative Order 22–1, ("MAO 22–1"), J.A. 32–40, which describes the functions and duties of the Office of the Chief Counsel. The Order explicitly refers to the three Acts Schlefer specified in his FOIA request.[12] The Chief Counsel and his or her delegates are directed to "approve," to "give legal clearance to," or to "review as to form and legality," matters arising under those Acts.[13] Other more general sections of MAO 22–1 that make no explicit reference to the three Acts, but nevertheless might require the Chief Counsel to issue a CCO interpreting those Acts, also grant de-

tial or does not occur at all. "Decisional" documents, we believe, do not become "deliberative" merely because some high agency official retains formal authority, deferentially or infrequently exercised, to overturn the decision. This view was apparently shared by the panel in *Coastal States, supra,* which considered it sufficient that regional counsel memoranda in that case had "operative and controlling effect over [requesting officials] unless the matter[s were] referred to a higher authority in the Department." 617 F.2d at 867.

A superior-subordinate relationship between the Chief Counsel and other Agency officers prevails, on matters of statutory interpretation, even when the officials do not first "voluntarily" solicit the Chief Counsel's legal advice. If no CCO is sought originally, the Chief Counsel's post-decision review simply substitutes for pre-decision CCO "advice."

**12.** The MAO 22–1 sections that explicitly refer to the three Acts of interest to Schlefer state that the Chief Counsel or his delegates within the Office of the Chief Counsel have the duty to:

2.01(2) *Approve* the mitigation or remission of the penalty against ships of 10,000 gross tons or more arising out of violations of the provisions of Sections 9 and 37 of the Shipping Act, 1916, as amended.

3.01(5) *Review and approve* citizenship status of applicants under various provisions of the Merchant Marine Act, 1936, as amended, the Merchant Ship Sales Act of 1946, as amended, and related statutes.

3.02(1) *Review and give legal clearance to:* (a) applications for construction-differential subsidies and other financial aid filed under Title V, Merchant Marine Act, 1936, as amended; (b) applications for the approval of capital construction funds under Title VI, Merchant Marine Act, 1936, as amended, and construction reserve funds under Section 511 of the Merchant Marine Act, 1936, as amended; (c) applications for operating-differential subsidy under Title VI of the Merchant Marine Act, 1936, as amended; and (d) applications for the trade-in, use and/or exchange of vessels under Section 510 of the Merchant Marine Act, 1936, as amended.

3.02(2) Prepare and *review as to form and legality* contracts, addenda thereto, and all related documents, including but not limited to the following types: construction-differen-

tial subsidy contracts under the Merchant Marine Act, 1936, as amended; contracts for ship design, ship construction, conversion, reconversion, reconstruction and reconditioning, and ship repair; capital construction fund agreements; contracts, bonds, regulations, and related documents pertaining to the award and payment of operating-differential subsidy and the operation of subsidized ships; use agreements, trade-in agreements, and ship exchange agreements.

3.03(1) *Review and give legal clearance to* applications for ship financing guarantees under Title XI, Merchant Marine Act, 1936, as amended.

3.06(1) *Review and give legal clearance to* applications for the operation of ships under agency or charter agreements pursuant to the provisions of the Merchant Marine Act, 1936, as amended, the Merchant Ship Sales Act of 1946, as amended, or other authorizations; the sale or purchase of ships under the Merchant Ship Sales Act of 1946, as amended, the Merchant Marine Act, 1936, as amended, and other authorizations; and research and development contracts, including review of invitations for bids, preparation of contracts, contractor selection and contract awards.

3.06(4) Collaborate with the Office of Marine Insurance in the preparation of insurance policies and other documents required in connection with the administration of the War Risk Insurance Program under Title XII, Merchant Marine Act, 1936, as amended; and on legal matters involved in the administration of the marine insurance provisions of contracts in which the Maritime Administration has an interest.

3.06(11) *Review and prepare recommendations for the approval of the [Chief] Counsel* or the Assistant Secretary for Maritime Affairs relative to the mitigation or remission of penalties against ships arising out of the violations to the provisions of Sections 9 and 37 of the Shipping Act, 1916, as amended.

J.A. 32–38 (emphasis supplied).

**13.** The only instance in which MAO 22–1 directs the Office of the Chief Counsel to deal with one of the Acts in a non-decision-making capacity involves circumstances that would not appear to occasion the issuance of a CCO. *See* MAO 22–1 § 3.06(4), set out *supra* note 12.

cision-making authority to the Chief Counsel.[14] The current Chief Counsel concedes that legal clearance of Agency action contrary to the advice of a CCO would be granted only if the Chief Counsel or his staff determined that the reasoning in the CCO was wrong. *See* J.A. 51–52.

Our view of the overriding importance of the Chief Counsel's clearance authority is reinforced by the three sample CCO summaries included in the record, J.A. 43–45, which the Agency accepts as typical, J.A. 29. All three appear to involve decisions for which, according to our reading of MAO 22–1, legal clearance by the Office of the Chief Counsel would be required. The first summary, J.A. 43, addresses an application for a loan under section 509, or mortgage insurance under Title XI, of the Merchant Marine Act, 1936.[15] Under MAO 22–1 sections 3.02(1) and 3.03(1), neither the loan nor the mortgage insurance could be granted without legal clearance from the Office of the Chief Counsel.[16] The second, J.A. 44, involves the disposition of capital construction funds under section 607(c) of the 1936 Merchant Marine Act, 46 U.S.C. § 1177(c).[17] Agency action on such a matter would require Office of the Chief Counsel legal clearance under MAO 22–1 section 3.02(1). The third, J.A. 45, addresses a section of the 1936 Merchant Marine Act, that was repealed in 1970. But it too appears to raise a question that would require Chief Counsel legal clearance.

The tone of CCOs themselves reflects the authority with which they are written. The examples included in the record are peremptory legal opinions or directives from the Chief Counsel, written with a clearly implied expectation that they are to be followed. In a 1939 CCO by Chief Counsel Farbach, for example, three prior Chief Counsel pronouncements are invoked with phrases such as: "On February 19, 1937, the Acting [Chief] Counsel ... *held* ..." and "On November 20, 1937, the [Chief] Counsel

**14.** 4.01 ... [E]ach Division of the Office of the [Chief] Counsel shall, with respect to the activities under its jurisdiction:
    1 Review and approve for legal sufficiency memoranda and recommendations relating to any of its functions.
    2 Review and approve for legal sufficiency notices, orders, and other documents which are required to be published in the Federal Register.
    3 Prepare legal opinions and furnish legal advice on all matters under its jurisdiction, including the construction, interpretation, and application of the provisions of contracts, agreements, General Orders, regulations and related documents.
J.A. 39. Many of the Office of the Chief Counsel's duties unrelated to the three Acts in question also involve giving legal clearance to decisions made by other Agency officials. *See, e.g.,* MAO 22–1 sections 3.01(3), (6), 3.02(6), 3.03(2), 3.06(5), (6), (8), (9), (10), (12), J.A. 33–38.

**15.** Three almost identical index cards of the one CCO in question are included in the record. The first reads:
    STATUTES
    Merchant Marine Act, 1936, Sec. 501
    Application for loan to construct, equip, and outfit a vessel on the Pacific Coast, to be operated out of Los Angeles and San Diego in tuna fishing in Mexican waters and on high seas off the coasts of Central and South America. Constitutes domestic trade within the meaning of Sec. 509—aid may be granted under Sec. 509, as amended, or such vessel may be the subject of an insured mortgage under Title XI. Not foreign commerce as to entitle applicant to a construction-differential subsidy under Sec. 501, as amended.
    J.A. 43.

**16.** The text of sections 3.02(1) and 3.03(1) is set out *supra* note 12. Section 509 of the Merchant Marine Act, 1936, referred to in the CCO summary, is part of Title V of that Act, referred to in MAO section 3.02(1). *See* 46 U.S.C. § 1159.

**17.** Two similar summaries of the CCO are reprinted in the record. The first reads:
    STATUTES
    Merchant Marine Act, 1936, Sec. 607(c) Question as to when a dividend from the special reserve fund, required under Sec. 607(c), MMAct 1936, as amended, may be permitted. The effect of the provisions of Sec. 607(c)(4) when read in the light of the preceding clauses of Sec. 607(c) and clause 5 of Sec. 606 is that dividends may be paid out of the special reserve fund only at the end of the periods prescribed in clause 5 of Sec. 606, namely, "at the end of any ten-year period during which an operating-differential subsidy has been paid, or when prior to the end of any such ten-year period, the contract shall be terminated".
    J.A. 44.

*ruled ...*" J.A. 6–7 (emphasis supplied). "Holdings" and "rulings" are not indicative of deliberative or advisory statements.

Finally, the Chief Counsel's ultimate decisionmaking authority on matters of statutory construction is confirmed by the practices and expressions of requesting officials and Chief Counsels. Neither the current nor any prior Chief Counsel whose testimony appears in the record could point to any instance in which a requesting official declined to follow the advice contained in a CCO that construed any of the three Acts of interest to Schlefer.[18] The conduct and statements of several Chief Counsels are equally revealing. In a June 1939 "typical" CCO, cited in full at J.A. 5–9, Chief Counsel Farbach was asked to construe one of the Acts by an Agency official who proposed his own disposition of the question raised. The proposal did not meet with Farbach's approval. Farbach reached his own, different conclusion and directly notified the affected outsider of the decision reached in the matter. The requesting official, whose proposal had been rejected, was apparently the last to learn of the outcome of the case. More recent Chief Counsels share similar views of their role. The Chief Counsel for the period 1970–73 stated that an Agency officer receiving a CCO "was expected to act consistently with the advice given. In those rare instances where an officer proposed to take an action in direct conflict with the advice given, the [Chief] Counsel's office did not grant legal clearance for that action." J.A. 75. When asked if action contrary to the advice of a CCO would receive legal clearance, the 1978–79 Chief Counsel admitted: "I do not recollect a situation in which I rendered a ... [CCO] which ever went back to an official or to the Assistant Secretary in which he adopted a different reasoning or solution." J.A. 65–66. The current Chief Counsel concedes that of the approximately ten CCOs prepared during his tenure none has been disobeyed by the requesting officials. J.A. 53–54.

In light of this record, the Agency has failed to demonstrate that the Chief Counsel merely "advises" requesting officials on matters of statutory interpretation. The district court's statement that each Agency official "is free to accept, reject or attempt to modify the opinion he receives," J.A. 90, measured against attentive and close review of the record, inaccurately characterizes this case. While officials outside the Office of the Chief Counsel might endeavor to have the Chief Counsel modify or reconsider a CCO, officials who simply "rejected" CCOs dealing with the three Acts in question here would be indulging in a futile gesture. Such gestures are never in fact made.

### B. Precedential Value of CCOs

A second test of the character of agency documents typed "law" by the FOIA requester and "deliberative" by the agency is the precedential weight the agency accords to the documents. *Taxation With Representation, supra*, 646 F.2d at 682; *Coastal States, supra*, 617 F.2d at 867.

The Agency here points to suggestions in the record that the precedential value of CCOs is limited. CCOs are not circulated throughout the Agency; the Agency's policy is that CCOs are transmitted only to the requesting official, and thereafter are accessible only by that official and Office of the Chief Counsel personnel. J.A. 26. CCOs are not revised or updated to reflect subsequent developments in the cases they address. J.A. 26, 87. Within the Office of the Chief Counsel, no attempt is made to compile the subsequent history of citation to prior CCOs.

On these grounds the Maritime Administration describes the CCO index as a mere "research tool," a "reading file," and insists that CCOs have "no binding precedential effect." J.A. 26. But the record is not as clear as the Agency would make it on this score. Indeed, all that the Agency can plausibly assert is that there are ambigui-

---

**18.** The Agency did present testimony to the effect that CCOs sometimes were not followed, Brief for Appellees at 7, but conceded that the CCOs in question did not involve Chief Counsel constructions of the three Acts. *See* deposition of former Chief Counsel Caras, J.A. 61–63.

ties, some space for debate. One need not search hard to find countervailing indications that CCOs are accorded significant precedential weight.

The absence of a method for circulating CCOs within the entire Agency is of little significance when statutory interpretation is a task reserved to the Office of the Chief Counsel, an office that *does* bind, summarize, index, and distribute to its staff, all CCOs. Moreover, the current Chief Counsel admits that nothing prevents requesting officials from discussing CCOs with other Agency officials. J.A. 59. That CCOs are not updated to reflect the actual dispositions of the cases they address is also of uncertain import. Updating may be unnecessary precisely *because* CCOs are dispositive, decisional documents; the *least* "deliberative" agency documents are also those least in need of updating to reflect subsequent developments. Nor can we draw any firm conclusion from the fact that the subsequent citation history of CCOs is not compiled. Perhaps the relatively small number of CCOs simply does not warrant the preparation of that type of research aid.

Material in the record not spotlighted by the Agency securely supports the conclusion that CCOs are often relied on as precedent.[19] One of the "typical" CCOs reprinted in the record, J.A. 5–9, cites three prior Chief Counsel memoranda as dispositive authority. The affidavit of a practicing attorney who advises clients regarding matters involving the Agency states that CCOs "have, not infrequently, been referred to by the [Agency] staff as either determinative or highly persuasive in regard to a legal question arising under the [1936 Merchant Marine] Act." J.A. 16. A former Chief Counsel's affidavit states:

> During my term as [Chief] Counsel, I, the Deputy [Chief] Counsel, the several Assistant [Chief] Counsel, and the staff attorneys within the Office of the [Chief] Counsel, used the index to consult prior related CCO[s] in preparing new opinions. The resulting CCO[s] often referred to, cited, and distinguished prior CCO[s]. This was done to maintain consistent legal positions within the Office of the [Chief] Counsel.

J.A. 75.[20] Finally, the present Chief Counsel concedes: "The purpose fulfilled by designating selected legal memoranda as CCOs is to preserve the more significant opinions for future reference by attorneys within the Office of the Chief Counsel." J.A. 26. Asked on deposition what qualifies a memorandum as "significant," and therefore a candidate for "CCO" status, the current Chief Counsel identified only two factors—the amount of research that went into preparing the memorandum, and the likelihood that the question addressed will recur. J.A. 55–56.

Reviewing the record as a whole, we think the Agency has failed to demonstrate that it does not accord prior CCOs significant precedential weight. Of course, the Office of the Chief Counsel decides each new case de novo, and retains the power to reject or modify earlier decisions; the same

---

**19.** The district court's remarks *directly* addressing the precedential value of CCOs, though qualified, indicate that substantial deference is accorded the opinions: "CCOs often cite prior CCOs which support the present opinion or distinguish CCOs which contradict the current opinion. There is however no requirement that prior CCO[s] be consulted or cited and different Chief Counsels have placed different emphasis on the need to research old CCOs.... Consistency of opinion is a factor in the Chief Counsel's decisions, but it is not a necessity. Each determination of the Chief Counsel is made *de novo*." J.A. 87.

**20.** Another former Chief Counsel was deposed as follows:

> Q. ... To the best of your knowledge ... when an official of the Agency requests the [Chief] Counsel's opinion, ... [does] he retain[ ] it in his files?
> A. I must assume that, knowing Government employees, that it's retained ....
> Q. Is there anything to prevent the requesting official from using the CCO or referring to it in connection with future actions which he may take in the same area?
> A. ... Based upon my experience, if there were a CCO which he felt enabled him to go forward with an action, that often happened—or that would often happen.
> J.A. 72–73.

can be said of courts that honor precedent. The question is not whether prior opinions are rigidly followed, but whether they provide important guidance. We conclude that the most likely function of the summary-indexes that Schlefer seeks disclosed is indeed the one he identifies: they serve to facilitate the use of CCOs to guide later decisions. *Cf. Taxation With Representation, supra,* 646 F.2d at 683.

## C.  Coastal States *and* Taxation with Representation

Two recent decisions of this court resolve FOIA questions closely analogous to those before us today. Our decision has been guided by and is in full harmony with those prior decisions.

In *Coastal States, supra,* the plaintiffs sought disclosure of documents prepared by regional counsel of the Department of Energy (DOE). The documents were legal memoranda interpreting DOE regulations in the context of particular facts presented to counsel by Agency auditors. The Agency invoked FOIA Exemption 5, claiming, *inter alia,* that the documents were part of the intra-agency deliberative process and within the scope of the attorney-client privilege. A panel of this court rejected both arguments.

The tone and apparent purpose of the memoranda involved in *Coastal States* are similar to those of the sample CCOs in the record before us. *Compare,* for example, 617 F.2d at 859 n. 6 with J.A. 12–13. Both sets of documents comprise legal memoranda that announce, in straight-forward, objective, and impersonal prose, counsels' constructions of regulations or statutes. The documents are not cast as suggestions or recommendations, and do not address general questions of agency policy. They do not invite a response from the requesting official; they contain no hint that they are anything but final.

In *Coastal States,* as here, the Agency insisted that the documents were not "formal" Agency interpretations or decisions,[21] and noted that a separate procedure existed for announcing such interpretations.[22] The Agency in *Coastal States,* like the Maritime Administration, maintained that the documents sought did not furnish "law" of the case to which they were addressed because "the interpretations were not 'binding' on the audit staff," [23] and because "the agency staff '[was] free to reject the memorand[a].'" [24] In *Coastal States,* as here, "in fact the advice was regularly and consistently followed by the non-legal staff...." 617 F.2d at 860.

The precedential value accorded the documents in *Coastal States* may have been marginally greater than that accorded CCOs. The *Coastal States* court noted:

> [I]n some of the offices the documents were indexed by subject matter and used as precedent in later cases; they were circulated among the area offices and supplied to new personnel; they were at times "amended" or "rescinded," which would hardly be necessary if the documents contained merely informal suggestions to staff which could be disregarded; and on at least one occasion a regional counsel memorandum involving the audit of a different firm was cited to a member of the public as binding precedent.

---

**21.**  617 F.2d at 859.

**22.**  *Id.* ("The agency points out that ... there is a published procedure for issuing such interpretations."); *compare with* current Chief Counsel Dickstein's Affidavit, J.A. 29 ("The actual working law of the agency is to be found in the policies, interpretations and decisions pronounced by the Maritime Administrator or his delegees .... All such interpretations, expressions of policy, and statements of final decisions are readily accessible public documents.").

**23.**  617 F.2d at 859; *compare with* current Chief Counsel Dickstein's Affidavit, J.A. 24 ("CCOs are not formally binding upon agency officials ....").

**24.**  617 F.2d at 859 (footnote omitted); *compare with* current Chief Counsel Dickstein's Affidavit, J.A. 24 ("The requesting official ... may adopt a different reasoning or solution to the problem.").

617 F.2d at 860 (footnotes omitted). However, the difference between this aspect of *Coastal States* and our case is slight. CCOs are not circulated within the Agency and are never amended or rescinded. On the other hand, they are indexed, and have been cited more than once as binding precedent. The minor differences between the two cases barely detract from their marked similarities.

*Taxation With Representation, supra,* involved a request for several types of documents prepared by the IRS's Chief Counsel. The documents most analogous to CCOs were "General Counsel's Memoranda" (GCMs) prepared by the Agency's Counsel on request by the Assistant Commissioner, usually in connection with the review of proposed private letter rulings, technical advice memoranda, and revenue rulings. With minor exceptions for Memoranda rejected by the Assistant Commissioner, this court ordered GCMs disclosed. 646 F.2d at 682.

In an attempt to distinguish the decision in *Taxation With Representation,* the Maritime Administration points out that GCMs are sometimes revised in line with the final decision taken by the Assistant Commissioner. In contrast, CCOs are never updated. This ground for distinction is unpersuasive, however, since GCM rewriting is done by the subordinate official who prepares the document (the Chief Counsel) to reflect a different decision made by the superior, the Assistant Commissioner. That updating process "eliminates whatever deliberative character these documents may have had prior to their being 'updated' or 'reconciled.'" 646 F.2d at 682. CCOs, which are not transmitted from subordinate to superior officer, have, from the beginning, no "deliberative character" to be eliminated. In short, document updating may confirm that the final product is *not* deliberative, but the absence of updating does not establish that the unrevised document *is.*

D. *Summary*

Whether CCOs constitute internal agency "law" cannot be determined mechanically

from the decisionmaking process formally prescribed by the Agency. In *Coastal States, supra,* we stated:

A strong theme of our opinions has been that an agency will not be permitted to develop a body of "secret law," used by it in the discharge of its regulatory duties and in its dealings with the public, but hidden behind a veil of privilege because it is not designated as "formal," "binding," or "final."

617 F.2d at 867, citing *Sterling Drug, Inc. v. FTC,* 450 F.2d 698, 708 (D.C.Cir.1971); *Schwartz v. IRS,* 511 F.2d 1303, 1305 (D.C. Cir.1975); *Ash Grove Cement Co. v. FTC,* 511 F.2d 815, 818 (D.C.Cir.1975). *Sterling Drug* explains the rationale that underlies these decisions:

[T]he policy of promoting the free flow of ideas within the agency does not apply here, for private transmittals of binding agency opinions and interpretations should not be encouraged. These are not the ideas and theories which go into the making of the law, they are the law itself, and as such should be made available to the public. Thus, to prevent the development of secret law within the Commission, we must require it to disclose orders and interpretations which it actually applies in cases before it.

We are impelled by the logic of *Coastal States* and its antecedents to rule for Schlefer on his FOIA request. The Maritime Administration has failed to refute Schlefer's well-documented claims that, in practice, CCOs are authoritative Agency decisions in the cases to which they are addressed and that, in practice, CCOs also guide subsequent Agency rulings. The record solidly supports the view that CCOs and their summaries are "statements of policy and interpretations which have been adopted by the agency," 5 U.S.C. § 552(a)(2), not "intra-agency advisory opinions," *NLRB v. Sears, Roebuck & Co., supra,* 421 U.S. at 149, 95 S.Ct. at 1515, that fall within Exemption 5.[25]

---

**25.** Schlefer also assails as unworkable the dis-    trict court's direction to segregate, for FOIA

## III. THE ATTORNEY-CLIENT PRIVILEGE

The Maritime Administration argues that the attorney-client privilege provides an independent ground for exempting from FOIA disclosure communications from the Chief Counsel to requesting officials.

The attorney-client privilege in federal courts protects communications from attorney to client to avoid the risk of inadvertent, indirect disclosure of the client's confidences. *Mead Data, supra,* 566 F.2d at 254 n. 25.[26] The privilege operates when 1) the communication from attorney to client is confidential, *and* 2) the communication is based on confidential information provided by the client. *Id.* at 254.

The factual information contained in the CCOs of concern to Schlefer is not provided by the "client"—the Agency official who solicits the Chief Counsel's advice—but by a third party—the outsider who seeks a ruling from the Agency. The outsider's communications to the official do not contain any confidential information *concerning the Agency;*[27] when the official transmits the relevant facts to the Chief Counsel, no new or confidential information *concerning the Agency* is imparted. *Cf. Brinton v. Department of State, supra,* 636 F.2d at 604; *Coastal States, supra,* 617 F.2d at 863; *Mead Data, supra,* 566 F.2d at 253. Accordingly, CCOs do not fall within the scope of the attorney-client privilege and are not within FOIA Exemption 5.

## IV. CONCLUSION

The Maritime Administration has failed to show that the CCOs in question are shielded from disclosure by FOIA Exemption 5. All index digests of CCOs interpret-

ing the 1916 Shipping Act, as amended, the 1920 Merchant Marine Act, as amended, or the 1936 Merchant Marine Act, as amended, should be disclosed to Schlefer. The decision of the district court ordering release of only those CCOs "relied upon" by the Agency is reversed and the case is remanded with instructions to order the Agency to produce the requested documents.

---

purposes, CCOs that the Agency "relied upon." Because we hold that all CCO index digests Schlefer describes in his request must be disclosed, we express no opinion on the practicability of a "relied upon" formula for FOIA disclosure.

**26.** The distinction between the [attorney-client privilege and the "deliberative process" exemption] is that the attorney-client privilege permits nondisclosure of an attorney's opinion or advice in order to protect the

secrecy of the underlying facts, while the deliberative process privilege directly protects advice and opinions and does not permit the nondisclosure of underlying facts unless they would indirectly reveal the advice, opinions, and evaluations circulated within the agency as part of its decision-making process.
*Mead Data, supra,* 566 F.2d at 254 n. 28.

**27.** As pointed out *supra* note 4, until the 1950s, the Agency published CCOs.