**Janet M. NESSE, as Chapter 11 Trustee of Blair Temporaries & Staffing, Inc., Plaintiff,**

v.

**Shaw PITTMAN, Defendant.**

No. 99–3081 (GK/JMF).

United States District Court, District of Columbia.

April 16, 2002.

David Freishtat, Freishtat & Sandler, Baltimore, MD, for plaintiff.

Michael Shobe Sundermeyer, Edward J. Bennett, Williams & Connolly, Washington, DC, for defendant.

## MEMORANDUM OPINION

FACCIOLA, United States Magistrate Judge.

On September 18, 2001, I issued a Memorandum Opinion and Order in which I granted in part and denied in part plaintiff's motion to compel production of a variety of documents. *Nesse v. Shaw Pittman*, 202 F.R.D. 344 (D.D.C.2001). I reserved judgment on one set of documents, a series of notes taken by Barbara Rossotti ("Rossotti"), a partner and member of Shaw Pittman's Management Committee, pending an eviden-

tiary hearing on the applicability of the work-product and attorney-client privileges. That hearing has now been held and yielded additional facts, noted below, concerning the creation of the documents at issue.

## BACKGROUND

In the fall of 1998, at the same time that the underlying events leading to this lawsuit were occurring, Shaw Pittman was in the process of substantially revising its retirement policy. In September 1998, the partners preliminarily voted to revise their partnership agreement so that partners reaching the age of 65 would be routinely transferred to senior counsel status, barring extraordinary circumstances. Tr.[1] at 31, 42–43. The shift to senior counsel would be accompanied by a substantial reduction in compensation. Tr. at 33. This retirement policy was further discussed throughout the fall of 1998 and became effective January 1, 1999. R. Kenley Webster ("Webster") was 66 at the time and thus was directly affected by the new policy. Learning of the decision to shift him to senior status and reduce his draw, Webster protested to the managing partner, Paul Mickey ("Mickey"), and sought an opportunity to plead his case before the Management Committee. Tr. at 45–46. Rather than convening the entire Management Committee, Mickey decided to establish a "task force" composed of partners Rossotti and Steven Huttler ("Huttler") to hear Webster's appeal. Tr. at 47, 58.

Rossotti took the notes at issue in this dispute during a series of meetings held between October 23, 1998, and November 5, 1998.

Philip Harvey ("Harvey"), Shaw Pittman's general counsel, was responsible for investigating Webster's role in a the potential lawsuit then brewing because of the manner in which Shaw Pittman withdrew from its representation of a client named Shirley Blair. Tr. at 41.[2] On October 14, Harvey began gathering information on what had occurred. Tr. at 6–7. In the course of this investigation, Harvey spoke to various Shaw Pittman attorneys involved in the Blair matter, including Webster. *Opposition to Plaintiff's Motion to Compel Production of Documents* at 14. On October 23, Harvey briefed the entire Management Committee on the Blair matter. Harvey also reported to Mickey, Rossotti, and Huttler on October 29. Tr. at 48. On November 2, Mickey, Rossotti, and Huttler met with Webster. Tr. at 48–49. The same individuals, *sans* Mickey, convened again later that same day for another discussion. Tr. at 100. Lastly, Rossotti and Mickey met once more on November 5.

Rossotti's notes from the October 23rd meeting bear the headings "re RKW" and "[RKW]." Pls. Exh. 2. The unredacted portions of the notes indicate that the Committee discussed Webster's past performance with respect to his joint representation of three individuals who were being investigated by the United States Department of Justice. *Id.* Webster had advocated to continue representing all three, but Harvey had advised against it based on ethical concerns. Tr. at 16–19.

Rossotti's notes from the October 29th meeting that included herself, Harvey and Huttler indicate that the discussion of the Blair matter came in the midst of a discussion of Webster's performance on other matters. After the section detailing the discussion of Blair, the notes then return to Webster's behavior in a non-Blair matter, although it appears that Harvey was not present at this final stage of the meeting. Tr. at 24. Harvey testified that his presence at the October 29th meeting was for the dual purposes of assisting his partners in making a personnel decision regarding Webster and also informing the Management Committee concerning the Blair matter. Tr. at 35.

Rossotti took just over four pages of notes during the first November 2nd meeting with Huttler, Mickey, and Webster. The first three pages deal exclusively with Webster's conduct in non-Blair matters. Pl. Exh. 4. Page four, which has been withheld and included in the privilege log, contains one para-

---

1. "Tr." is a reference to the transcript of the hearing held before me on February 25, 2002.

2. For a fuller explanation of the events leading up to that lawsuit, see *Nesse,* 202 F.R.D. at 344.

graph regarding Webster's role in the Blair matter. SP000102. Mickey and Rossotti both testified that Mickey essentially summarized information that had been conveyed to him by Harvey. Tr. at 86, 99. The notes suggest that, at some point during Mickey's summary, Webster interjected and offered his version of what had occurred. SP000102.

The second meeting on November 2 involved Huttler, Rossotti, and Webster. Tr. at 100. The heading of Rossotti's notes from this second meeting is "re: rkw." Pl. Exh. 12. Rossotti took nine pages of notes during this meeting, six of which were produced and three of which were withheld. These three withheld pages detail a discussion of the Blair matter, but this time Webster himself provided all of the information about the topic. Tr. at 100. Following this meeting, Rossotti conveyed to Mickey what she had learned from Webster, with the understanding that Mickey would then pass the information along to Harvey. Tr. at 101.

Finally, on November 5, Rossotti took a half-page of notes from a discussion with Mickey regarding the Blair matter. The notes indicate that the source of Mickey's information was Harvey, meaning that it was based on what Harvey learned from the lawyers (including Webster) who had handled the Blair matter.

## DISCUSSION

Shaw Pittman claims that Rossotti's notes are protected by both the attorney-client and work-product privileges. After reviewing the testimony at the evidentiary hearing, the parties' respective briefs, and the notes themselves, I conclude that most of the notes are covered by the attorney-client privilege. The notes from one meeting, however, are not covered by either privilege and I shall order them produced.

*Attorney–Client Privilege*

As frequently occurs when a member of a corporation has been accused of wrongdoing, Shaw Pittman asked its general counsel to conduct an internal investigation. *See, e.g., Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). Some

of the results of this investigation were later captured in Rossotti's notes from various meetings. In assessing the applicability of the attorney-client privilege to Rossotti's notes, it helps to pinpoint the roles of the key individuals who were involved in the various communications. In addition, because the privilege applies to particular communications,[3] I shall trace the applicability of the privilege through a complex series of communications, from the point of origin at Webster's and other lawyers' lips to the moment when the ink met the paper on Rossotti's note pad.

■ The attorney-client privilege protects confidential communications made by the client to an attorney for the purpose of seeking legal advice. *Tax Analysts v. Internal Revenue Service,* 117 F.3d 607, 617 (D.C.Cir. 1997). The "client" for the purposes of this discussion is the firm itself. By extension, Webster and other partners and employees of the firm are also clients. Harvey, acting as the firm's general counsel, is the "attorney." Thus, when Harvey conducts his investigation and gathers information from Webster and other partners and associates, all communications from those clients to Harvey are privileged. *Upjohn,* 449 U.S. at 390–397, 101 S.Ct. 677.

■ In turn, communications from the attorney to the client are also privileged if their disclosure would reveal the client's confidential communications to the attorney. *Coastal States Gas Corp. v. Department of Energy,* 617 F.2d 854, 862 (D.C.Cir.1980). As I wrote in *Evans v. Atwood,* 177 F.R.D. 1 (D.D.C.1997):

This Circuit, however, more narrowly defines the attorney-client privilege to protect from disclosure the communications made by the client to the attorney for the purpose of seeking legal advice. *Tax Analysts v. Internal Revenue Service,* 117 F.3d 607, 617 (D.C.Cir.1997). The privilege protects the communications made by the attorney to the client only insofar as the attorney's communications disclose the confidential communication from the client. *Brinton v. Department of State,* 636 F.2d

---

3. *Upjohn,* 449 U.S. at 395, 101 S.Ct. 677.

600, 603–604 (D.C.Cir.1980). *See Schlefer v. United States,* 702 F.2d 233, 244 (D.C.Cir.1983); *Coastal States Gas Corporation v. Department of Energy,* 617 F.2d 854, 862 (D.C.Cir.1980); *Mead Data Central v. United States Department of the Air Force,* 566 F.2d 242, 253 (D.C.Cir. 1977).

*Id.* at 3; *see also Eugene Burger Management Corp. v. United States Dept. of Housing and Urban Development,* 192 F.R.D. 1, 5 (D.D.C.1999). Hence, "[c]ommunications from attorney to client are shielded if they rest on confidential information obtained from the client." *In re Sealed Case,* 737 F.2d 94, 99 (D.C.Cir.1984)(quoting *Mead Data Central, Inc. v. United States Department of Air Force,* 566 F.2d 242, 254 (D.C.Cir.1977)); *see also Brinton v. Dept. of State,* 636 F.2d 600, 603 (D.C.Cir.1980). By insisting on a relation back to a client's confidential communication, such a rule squares with the overarching purpose of the attorney-client privilege, i.e., to ensure that *clients* receive the most effective legal assistance. Any protection from disclosure that the attorney gains from the privilege is merely derivative, insofar as it stems from and redounds to the client.

■ Following these principles, a privileged communication made to an attorney by one member of a corporate client does not lose its privileged status by being passed on from that attorney to other members of the client. *Mead Data Central,* 566 F.2d at 253 n. 24 (extending the privilege to communications from an attorney to "all agents or employees ... authorized to act or speak for the organization in relation to the subject matter of the litigation"); *see also Lambert v. Credit Lyonnais (Suisse) S.A.,* 160 F.R.D. 437, 442 (S.D.N.Y.1995) (upholding the attorney-client privilege in similar circumstances because the decision-making power of the corporate client may be diffused among several employees).

■ Here, Harvey received confidential and privileged communications from certain members of the client and then proceeded to relay the substance of those communications to other members of the client. Thus, when Harvey reports to the Management Committee on October 23 and meets with the Huttler–Rossotti task force on October 29, Harvey's communications are indeed privileged under *Mead Data Central* and *Brinton,* for they are a reiteration of Webster's and other associates' earlier privileged communications.

■ The notes from the first November 2nd meeting and the November 5th discussion, in which Mickey summarizes information learned from Harvey, also are privileged because they indirectly capture Webster's earlier communications to Harvey. That the communications come through Mickey, and not directly from Harvey, does not alter the essential fact that the communications stem from an original privileged source, i.e., the conversations Harvey had with Webster and the other lawyers who had knowledge about the Blair matter. *See Shriver v. Baskin–Robbins Ice Cream Co.,* 145 F.R.D. 112, 114 (D.Colo.1992); *Barr Marine Prod. Co. v. Borg–Warner Corp.,* 84 F.R.D. 631, 634 (E.D.Pa.1979); *SCM Corp. v. Xerox Corp.,* 70 F.R.D. 508, 518 (D.Conn.1976).

■ Finally, the privilege attaches to Rossotti's notes, which are not, strictly speaking, communications from Harvey to Rossotti, but rather Rossotti's memorialization of such communications. It would make little sense to say that a communication from Harvey to Rossotti is privileged, but that the firm loses this privilege merely upon Rossotti's committing what Harvey said to paper. Such a rule would discourage parties, for no good reason, from memorializing in writing information that is unquestionably privileged.

■ In contrast, it is difficult to understand how the privilege would attach to Rossotti's notes from the second November 2nd meeting involving herself, Huttler, and Webster. Harvey, the acknowledged attorney, was not present at this meeting. Moreover, unlike the case of the first November 2nd meeting and the November 5th discussion, none of the information regarding the Blair matter discussed at this meeting had been transmitted through Harvey. Rather, Webster was directly offering his version of those events first-hand. This was a strictly client-to-client discussion of Webster's version of

what led to the potential lawsuit and his role in the events leading up to that lawsuit.

Any other rule would insulate from disclosure what clients say to each other merely because they have been discussing a matter that their attorney has investigated and, during that investigation, has spoken to one of the participants in the discussion. Shielding the exchange among clients has nothing to do with encouraging them to be candid when they speak to a lawyer and the law has no interest in whether they are candid with each other.

It is certainly true that Rossotti intended to convey to Mickey what Webster had said at the second November 2nd meeting, anticipating that Mickey would then tell Harvey. But this case must be distinguished from those in which one member of the client group discusses a distinctly legal matter with another and the latter conveys that information to an attorney for the purpose of securing legal advice. *E.g. First Wisconsin Mortg. Trust v. First Wisconsin Corp.*, 86 F.R.D. 160, 171 (E.D.Wis.1980); *Burlington Indus. v. Exxon Corp.*, 65 F.R.D. 26, 38–39 (D.Md.1974). That Harvey ultimately received the information that Webster communicated to Rossotti could not have anything to do with advancing the societal interest in encouraging clients to be candid when they speak to their lawyers. In this vein, it must be remembered that Rossotti and Huttler had been assigned the specific task of entertaining Webster's appeal of his forced retirement. Thus, when Webster sat down with Rossotti and Huttler, he would not and did not have any reason to suppose that his pleading his own case as to his employment status had anything to do with Harvey's representation of Shaw Pittman. The progression of the communication from Webster to Rossotti to Mickey to Harvey constitutes a chain in which the links so differ from each other in terms of the motivation of the speaker and the reporter that to consider them equally privileged shields a conversation from disclosure even though the original

communicator has no intention that the information be provided a lawyer for the purposes of legal representation. At that point, the interest in advancing client candor has become so attenuated, if it exists at all, that is trumped by the law's interest in ascertaining the truth.

■ Plaintiff may protest, however, that shielding Rossotti's notes of what Harvey learned from the other lawyers, including Webster, ignores that the meetings Rossotti attended have different purposes or even multiple purposes. A central requirement for the application of the attorney-client privilege is to protect a confidential communication made for the purpose of securing legal advice or legal representation. Certainly, my September 18, 2001 opinion indicates that I believed the purpose motivating the lawyer's communication to the client was crucial. *Nesse*, 202 F.R.D. at 344. Having heard the testimony and having considered more comprehensively the significance of the *Upjohn* case, I refine my decision. I must focus exclusively on the reason why the lawyer collects the information from the client in the first place, and disregard the motivation behind the lawyer's subsequent communication thereof, so long as the lawyer is speaking to persons with whom the lawyer has a privilege.[4] *Upjohn* is, after all, a dramatic development in the law of attorney-client privilege, for it views the privilege as a function of the purpose for which the lawyer collects the information. Moreover, the case extends the privilege's application to any conversations with persons employed by an organization that advance the attorney's responsibility as an advocate to the organization, even though the lawyer is speaking to those people not to give them legal advice or representation but to advance the lawyer's obligation to the organization by which they are both employed.

To apply the privilege to the communication of information that the lawyer learns from one member of the organization to an-

---

4. The only relevant consideration regarding the attorney's subsequent communication is that of confidentiality. If the attorney communicates information gathered from a client to an outside party, there arises a presumption that the client's communication was not intended to be privileged. In any event, this issue need not bother us here, for it is undisputed that all of the Shaw Pittman participants maintained the confidentiality of the communications.

other member of the organization seems, at first glance, illogical; if one member of the organization told another exactly what he had told the lawyer, no one would seriously suggest that their conversation is privileged.[5] But when one of them is talking to a lawyer for the organization, who has an obligation to represent that organization competently, the privilege does apply so as to encourage that client to be as candid as possible when she speaks to the lawyer. In the easy case, where the lawyer communicates what he was told by one member of the client organization to another member of the client and then proceeds to give legal advice or provide legal representation concerning the significance of that communication, *Upjohn* expressly prohibits a compelled disclosure of what the lawyer was told in the first place. But in the closer case, where the lawyer tells one member of the client group what she (the lawyer) has learned from another member of the client group, compelled disclosure violates the *Upjohn* proscription irrespective of the reason why the member of the client group sought the information or what use the latter will make of it.

This case is a perfect example of that phenomenon. Webster is not the first attorney and he will not be the last whose conduct leads to a lawsuit against his law firm. He is also not the first to be called to account with his job on the line. Quite understandably, the firm members wanted to know what Harvey had learned about Webster's conduct as part of their assessment of whether Webster should remain a full partner. To abrogate the privilege because Rossotti and others received the information for non-legal purposes would defeat the purposes of the attorney-client privilege, as laid out by the Supreme Court. *Upjohn* encourages candor by eliminating the risk that the lawyer will have to disclose what members of the organization confided to him. The privilege depends on the certainty that the more likely the disclosure, the less likely the candor. If the privilege turns on the subsequent use made of the information, however, that certainty disappears, since the person speaking to the lawyer cannot possibly foresee all the many

ways in which other members of the organization will use what she tells the lawyer in the first place. The client will therefore lose the motivation she has to be candid if the availability of the privilege shifts like sand.

In this context, it must be remembered that *Upjohn* emphasized the societal interest in predicting with certainty when the attorney-client privilege would apply:

> But if the purpose of the attorney-client privilege is to be served, the attorney and client must be able to predict with some degree of certainty whether particular discussions will be protected. An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all.

449 U.S. at 391, 101 S.Ct. 677.

If, on the other hand, the application of the privilege turns on the motivation or intention of the person who ultimately hears it, it is impossible to define in advance when the privilege will apply because there are no clear standards to distinguish what we will have to clumsily call a "legal" from a "non-legal" motivation. Making the privilege turn on what some court ultimately determines to be the primary or motivating factor in a subsequent communication, without defining clear standards as to what factors are legitimate, violates in the most obvious way the command of *Upjohn* that the potential application of the privilege be as clear as possible.

*Work–Product Privilege*

Because all but one set of Rossotti's notes are within the attorney-client privilege, the question then becomes whether the one exception—Rossotti's notes of what Webster said about the Blair matter at the second November 2nd meeting—are nevertheless protected by the work-product privilege contained in Fed. R. Civ. 26(b)(3).

■ The rule in theory applies to materials prepared by Rossotti who, as a partner in Shaw Pittman, is a party to the action. By the same token, it must be remembered that the motivation for Rule 26(b)(3) is the socie-

---

**5.** In fact, this seems to be exactly what took place at the second November 2nd meeting, where Webster spoke directly to Rossotti and Huttler.

tal interest in an adversarial judicial system, which is advanced by prohibiting one lawyer from invading his opponent's preparation except in the most extraordinary situations. Thus, as I have concluded, Harvey's interviewing Webster and other Shaw Pittman partners and associates falls perfectly within the work-product privilege ethos. But Rossotti's taking notes is a much less perfect fit. Although as a partner, she is unquestionably concerned that a disgruntled client may sue the firm, exposing her to personal liability, unlike Harvey, she has not been assigned the responsibility of defending or advising the firm on the Blair matter. Thus, while she anticipates litigation, she does so as a party, concerned that it will arise and about its implications for her and her partners. It does not minimizes those concerns unfairly to refuse to equate her with the trial advocate, preparing her case in jealous privacy, who is described in *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). So, while the privilege on its face protects documents created by a party, that party's mere generalized concern about litigation does not warrant the protection of all documents pertaining to the matter.

It is for this reason that I must reaffirm my earlier view that the "primary purpose" behind the creation of Rossotti's notes must control.[6] Having heard her testimony, I credit entirely that she was concerned about the lawsuit. But, I must conclude that in interviewing Webster she was not preparing for trial or preparing a document in anticipation of litigation. Instead, she was recording Webster's analysis of several matters that he had handled for the firm, of which the Blair matter was only one. In doing so, Rossotti was fulfilling her responsibility to the Management Committee to hear Webster out as to his complaints about the unfairness of its personnel decision. While her role coincided with the realistic anticipation that the Blair matter was poised to explode into expensive

litigation, I cannot equate her function with Harvey's or with the paradigm of the trial lawyer, preparing for trial, who comes close to being eulogized in *Hickman.* To do so would be to conflate roles—the lawyer (Harvey) preparing the firm's defense and the lawyer (Rossotti, Huttler and Mickey) as partners and owners grappling with a personnel matter—that are fundamentally dissimilar.

---

**6.** At the oral argument, Shaw Pittman's counsel valiantly tried to urge me to reconsider my earlier finding that the "primary purpose," and not the "because of" test applied in this circuit. After reviewing *In re Sealed Case,* 146 F.3d 881, 884 (D.C.Cir.1998), I acknowledge that this case is not a solid holding in favor of the primary purpose test. At the same time, neither does it embrace the "because of" test. Thus, I am left with uncertainty at the circuit level, forcing me to choose between the two standards. As I state herein, it is my view that the primary purpose test better fits the aims of the work-product privilege, while the "because of" test paints with an unduly broad brush.