Janet M. NESSE, as Chapter 11 Trustee
of Blair Temporaries & Staffing,
Inc., Plaintiff,

v.

Shaw PITTMAN, Defendant.

Civ.A. No. 99–3081 (GK/JMF).

United States District Court,
District of Columbia.

Sept. 17, 2001.

David Freishtat, Freishtat & Sandler, Baltimore, MD, for plaintiff.

Michael Shobe Sundermeyer, Edward J. Bennett, Lynda Schuler, Williams & Connolly, Washington, DC, Matthew A. Ranck, Ec-

cleston and Wolf, P.C., Baltimore, MD, for defendants.

## MEMORANDUM OPINION

FACCIOLA, United States Magistrate Judge.

This Opinion and accompanying Order resolves plaintiff's *Motion to Compel,* filed with the Court on September 26, 2000.

## I. BACKGROUND

Plaintiff represents Blair Temporaries & Staffing, Inc. ("Blair"), a Maryland corporation that provides employee support staffing to businesses on a temporary basis. In September, 1997, Blair and Classical Financial Services, LLC ("Classical") entered a loan agreement by which Classical agreed to extend Blair a revolving line of credit. The loan was secured by Blair's assets and accounts receivable. In April 1998, Blair retained the law firm Shaw Pittman ("SP") to handle all of its legal needs. Throughout the spring and summer of 1998, the relationship between Blair and Classical became strained as a result of various accounting disputes. During this period, several attorneys at SP, including Michael Hatcher ("Hatcher"), Weldon Latham ("Latham"), and John M. Bryson II ("Bryson"), participated in the firm's representation of Blair in its negotiations with Classical. On September 30, 1998, Classical filed a Complaint, and a Motion for Temporary Restraining Order and Preliminary Injunction against Blair and Shirley Blair ("Ms. Blair"), president and sole shareholder of Blair, in the Circuit Court for Montgomery County, Maryland. Chris Janney ("Janney"), another SP attorney, represented Blair at the proceeding, in which Classical sought immediate appointment of a receiver. The Circuit Court Judge ordered that Blair show cause why a receiver should not be appointed and scheduled a hearing on the matter for 10:00 a.m. on October 13, 1998. The show cause order was served on Janney at the conclusion of the hearing.

In the two weeks preceding October 13, SP attorneys communicated by telephone with Blair in preparation for the hearing. Because none of the attorneys already familiar with the case would be available on October 13, R. Kenly Webster ("Webster") was assigned to represent Blair at the hearing.

But as the hearing drew nearer, SP became increasingly frustrated by Blair's failure to pay outstanding fees. Throughout the week of October 5–9, Bryson repeatedly pressed Ms. Blair and Merrick Malone ("Malone"), Blair's general counsel and chief operating officer, to pay Blair's outstanding fees. In addition to the fee dispute, SP maintains that it had become vexed by actions taken by Ms. Blair that were in conflict with SP's advice. SP's frustrations culminated in a meeting on the afternoon of Friday, October 9, when Webster, Bryson, Latham and Phillip Harvey ("Harvey") met to discuss how to handle the matter. Latham was a partner who initially recruited Blair as a client and who was supervising Webster's work. Harvey was a partner, SP's in-house general counsel and head of its ethics committee. After obtaining Harvey's approval of the propriety of an immediate withdrawal, Latham and Webster made a decision to withdraw from representation and faxed a letter communicating this decision to Blair at approximately 3:45 p.m. on Friday afternoon. Webster followed up with a phone call a short while later. Bryson also advised one of Classical's attorneys, Ronald Wick ("Wick"), that SP was withdrawing from the matter. Since the coming Monday was Columbus Day, that Friday was the last business day before the hearing on Tuesday.

There is some dispute over the chain of events that occurred between Ms. Blair's receipt of the fax and the morning of October 13. Ms. Blair contends that, upon receiving the fax and the follow-up phone call, she left word for Latham to call her immediately. She claims that she spoke with Latham that Friday afternoon and that he promised SP would represent Blair and Ms. Blair at the October 13 hearing. Latham claims, however, that he did not speak with Blair until 3:00 p.m. on Monday, October 12.

At some point that same Friday afternoon, Harvey, after he had met with Bryson, Latham and Webster, sent a voice mail message to all three. According to Harvey, his message indicated that, although SP could still attempt to withdraw, Blair should not be left unprotected at the hearing. At the very least, Harvey directed, SP should make an

appearance and seek to have the hearing continued if Blair had not found another lawyer. If they could not obtain a continuance, then SP should be prepared to defend Blair on the merits. Harvey Deposition, at 68–70, 72–75, 117–118.

On October 11 and 12, Bryson sent voice mails and held a telephone conversation with Webster further discussing how to handle the upcoming hearing. Bryson Deposition, at 203–208. On October 12, Ms. Blair spoke with Webster and possibly Latham at 3:00 p.m. and claimed to have come away with the impression that Webster would be representing Blair at the next morning's hearing. Based on Webster's alleged assurances that she would be represented and by assertions made the previous week that the hearing would only cover accounting matters, Ms. Blair went ahead with a previously scheduled business trip to Memphis, Tennessee. Nevertheless, Ms. Blair alleges that Webster did not prepare for the October 13 hearing, as he never intended to defend Blair on the merits.

Following the 3:00 p.m. call to Ms. Blair on October 12, Webster, Latham, and Harvey communicated by voice mail. Although the details of these communications are uncertain, Ms. Blair asserts that a decision was made to rescind any promises made by Latham or Webster subsequent to the October 9 fax to represent Blair at the hearing. In effect, plaintiff claims, SP made a conscious decision to abandon her. At around 5:00 p.m. on October 12, Latham instructed Webster to draw up a final bill for SP's services, which Ms. Blair cites as further proof of SP's decision to withdraw unconditionally.

The next morning, October 13, Webster, who was not himself admitted to the Maryland Bar, appeared at the hearing with Julia Judish, a SP attorney who was a member of the Maryland Bar. Upon requesting the court clerk to call the case out of turn as a preliminary matter, Webster informed the court "as a matter of courtesy" that SP had withdrawn from its representation of Blair, after which he sat down and made no further statements. Transcript ("Tr") of 10/13/98 Hearing ("Hr'g") in Civ. Matter 192395, at 3. Also present in the courtroom were Merrick Malone (Blair's general counsel and chief operating officer) and Thomas O'Malley ("O'Malley"). Malone was an attorney but was not licensed in Maryland. Hence, the judge prohibited him from speaking at all before the Court. Tr. 10/13/98 Hr'g, at 7. O'Malley was a member of the Maryland Bar but had not been retained by Blair, had not entered an appearance in the matter, and did not attempt to participate in the proceedings. Tr. 10/13/98 Hr'g, at 5. In fact, Blair had met with O'Malley the day before but O'Malley had declined to represent her. O'Malley Deposition at 10–11. O'Malley testified that he only dropped in on the hearing because he was at the courthouse on an unrelated matter. O'Malley Dep. at 13. After a few minutes of sorting out whether anyone was present to represent Blair, the Court conducted a brief *ex parte* hearing and issued an order granting receivership to Classical. Tr. 10/13/98 Hr'g, at 2–13.

SP claims that Webster considered Blair's interests to be adequately represented by Malone and O'Malley and therefore properly withdrew at the hearing. Blair contends that Webster withdrew immediately, before he even knew that Malone and O'Malley were in the courtroom. She further alleges that, based on the previous afternoon's decision to abandon her, Webster never intended to enter an appearance before the court, and had not prepared for the hearing in any substantive way.

Malone called Ms. Blair on October 13 after the hearing and she promptly returned home from Memphis. She called Latham on October 14, expressing her outrage and demanding that SP "fix" the problem they had created. From October 14 on, SP took a variety of response measures on which the current discovery dispute centers. Several SP attorneys, at Harvey's direction, conducted a review of what had occurred at the October 13 hearing and the events leading up to it. Hatcher spoke with Ms. Blair on October 15. The matter was discussed at various management meetings in late October and early November. Between October 23 and October 28, drafts of a response letter to Ms. Blair were circulated throughout the office. In December, Harvey sent several e-mails to his co-workers regarding settlement discussions with Ms. Blair and her new counsel.

One post-October 13 event in particular plays a significant role in the present discovery dispute. On November 2, Blair's new counsel, Emil Hirsch ("Hirsch"), filed an Emergency Motion to Vacate Preliminary Injunction Appointing Receiver. The motion alleged that on October 13, Blair was stunned to discover that Webster had appeared at that morning's hearing solely to withdraw from the case. Upon being served with the motion on November 2, Wick, Classical's counsel, called Webster to let him know of this allegation. Webster then requested that Wick fax him a copy of the motion, and Wick obliged on November 3. The two spoke several times on November 2 and 3 about the allegations, and Webster informed Wick of the contents of SP's October 9 withdrawal letter to Blair. Blair charges that Webster did not mention any of the uncertainty over what sort of promises SP had made to Ms. Blair between October 9 and 12, and allegedly gave the impression that Blair was fabricating the allegations in the Emergency Motion. Based upon his communications with Webster, Wick's opposition to Blair's Emergency Motion alleged that Blair's motion had entirely misrepresented the facts of SP's withdrawal and charged Blair with maligning SP. In particular, Wick stated:

> Blair Temporaries' motion is based on perjury. In their desperation to continue their fraudulent and arguably criminal conduct, defendants now defame a reputable law firm—Shaw Pittman Potts & Trowbridge—and claim it committed malpractice by not advising them it was withdrawing from representation. Shaw Pittman has confirmed to Classical's counsel, Baker & Hostetler LLP, that it did so advise defendants, properly and in writing, on Friday, October 9, when it also so-advised Baker & Hostetler LLP.

*Opposition to Motion to Vacate Preliminary Injunction* at 1.

## II. ANALYSIS

Plaintiff, Janet M. Nesse, brings this action as Chapter 11 Trustee of Blair. The suit is grounded chiefly in common law fraud, malpractice, breach of contract and negligent representation. The current discovery dispute centers on documents generated after October 13 and related deposition questions. SP claims both attorney-client and work-product privileges for 27 documents and certain deposition questions that relate to communications among SP attorneys after October 13. It claims solely the work-product privilege for another four documents. Among the withheld documents are the draft letters to Blair, handwritten notes by Webster, handwritten notes by Hatcher, SP management committee notes by committee member Barbara Rossotti ("Rossotti"), and e-mails from Harvey to other firm members regarding Blair's claims against SP.

Plaintiff offers four main arguments for why the two privileges should not apply.[1] First, plaintiff argues that the work-product privilege does not apply because SP did not reasonably anticipate litigation until at least December. Alternatively, plaintiff contends that even if SP did reasonably anticipate litigation as of October 14, plaintiff meets the substantial need and undue hardship exceptions to this privilege. Next, plaintiff seeks to apply a fraud exception to both attorney-client and work-product privileges, based on the principle that neither privilege should operate to withhold documents or communications intended to further a crime or fraud by the party seeking to withhold production. Finally, plaintiff contends that an impermissible conflict of interest by a party's counsel may defeat both the attorney-client and work-product privileges.

Because the work-product and attorney-client privileges operate independently of each other, the application of either will act to shield from production those documents for which both privileges are claimed. As I recently said in another case:

> Since the defendants claims the work product for all remaining documents but the attorney-client privilege for only some of them, the greater includes the lesser. If I determine that the work product privilege applies to all of them and plaintiff cannot

---

1. Plaintiff does not argue that the predicate elements of attorney-client privilege are not met. Rather, she seeks to defeat this privilege through either the fraud exception or the conflict of inter-est exception. *See In re Sunrise Securities Litigation,* 130 F.R.D. 560, 595 (E.D.Pa.1989) (attorney-client privilege may exist with respect to a law firm acting as its own counsel).

overcome the privilege, there is no need to rule on the attorney-client privilege as to those documents. I will initially follow that practice, borrowing it from the Court of Appeals. *See Equal Employment Opportunity Commission v. Lutheran Social Services,* 186 F.3d 959, 968 (D.C.Cir.1999). *McPeek v. Ashcroft,* 202 F.R.D. 332, —— ——, 2001 WL 957398, *6–*7 (D.D.C.2001).

Here, too, because defendant claims the work-product privilege for all of the documents and deposition questions, I need first determine whether this privilege attaches. If I determine that it does, and plaintiff cannot overcome that privilege, there is no need to consider the applicability of the attorney-client privilege to these documents. I therefore need only consider the attorney-client privilege as to those four documents which may not be covered by the work-product privilege.

### Work–Product Privilege

*In Anticipation of Litigation*

■ The work-product protection may apply only to materials that "can fairly be said to have been prepared or obtained because of the prospect of litigation." *In re Sealed Case,* 146 F.3d 881, 884 (D.C.Cir.1998). As I recently stated:

> To qualify for work product protection, the documents must be prepared for trial or in anticipation of litigation. The latter requirement is met in this Circuit whenever the materials are prepared in light of a lawyer's subjective and objectively reasonably belief that litigation was a real possibility. *Lutheran Social Services,* 186 F.3d at 967. Thus, a genuine fear of litigation will suffice when, for example, anonymous documents accuse an organization's president of creating a hostile work environment for female employees, id., or when the chairman of the Federal Election Commission announces that the agency is investigating allegations of illegal contributions in United States elections and the press has accused the Republican National Committee of evading federal campaign finance laws by accepting and structuring the receipt of a particular contribution. *In re Sealed Case,* 146 F.3d 881 (D.C.Cir. 1998). A specific claim is unnecessary if

the anticipation of litigation is reasonable. *Id.; Schiller v. National Labor Relations Board,* 964 F.2d 1205, 1208 (D.C.Cir.1992). *McPeek,* 202 F.R.D. at ——, 2001 WL 957398, *7.

■ Plaintiff asserts that defendant did not reasonably anticipate litigation until December, when SP filed a notice of claim with its insurance carrier. Defendant responds that it reasonably anticipated a suit from the moment Ms. Blair called Latham on October 14 and demanded that SP "fix" the problem. SP has submitted declarations from firm members indicating that they feared Blair would sue them after Blair complained to Latham on October 14. Harvey Declaration, at 1; Rossotti Declaration, at 1; Mickey Declaration, at 1.

Their belief was eminently reasonable. A phone call from an admittedly irate Ms. Blair, in which she unequivocally demands redress for a grievance, was enough to alert SP to a possible lawsuit. Surely, lawyers know that withdrawing from a client's representation without the client's express consent can engender harsh feelings of abandonment by the client, particularly when the withdrawal occurs during an actual court proceeding. Fearing that an angry client, demanding immediate redress, might sue the firm under these circumstances is no doubt objectively reasonable. That SP did not give written notice to its insurance carrier until December 14 does not somehow retroactively nullify the reasonableness of SP's earlier anticipation of litigation.

■ Additionally, I have examined the documents and, with the one possible exception of certain management committee notes, they cannot possibly be described as having been prepared in the ordinary course of business, rather than in anticipation of litigation. The documents were generated in specific response to the possibility that Blair would sue SP. The ordinary business of a law firm is defending its clients, not itself. Documents relating to a potential suit by a former client are simply not generated in the ordinary course of SP's daily business activities.

*Substantial Need and Undue Hardship*

■ Federal Rule of Civil Procedure 26(b)(3) provides that an attorney's work

product may be subject to discovery only upon a showing of substantial need and undue hardship. Moreover, even if the work-product privilege yields to a showing of need, the court must still protect absolutely the "mental impressions, conclusions, opinions or legal theories of an attorney." *See Tax Analysts v. Internal Revenue Service,* 117 F.3d 607, 619 (D.C.Cir.1997).

[redacted] As to substantial need, plaintiff claims that because defendant's conduct is directly "at issue" in the present case, the work-product privilege must not attach, citing *Charlotte Motor Speedway, Inc. v. International Ins. Co.,* 125 F.R.D. 127 (M.D.N.C. 1989), and *Securities and Exch. Comm'n v. National Student Mktg. Corp.,* 18 Fed. R. Serv.2d (Callaghan) 1302, 1305 (D.D.C.1974). Although both of these cases allowed the movant to discover opinion work product that was directly at issue, plaintiff attempts to apply them to an entirely different context. In both *Charlotte Motor Speedway* and *Securities Exch. Comm'n,* the attorney work product that was held discoverable consisted of first-order materials, i.e., those generated on behalf of a client in prior litigation.

Here, plaintiff has already obtained these first-order, pre-October 14 materials and now seeks "second-order" documents, i.e., those brought about specifically in response to plaintiff's threat of litigation. Moreover, this work product is only "at issue" here because plaintiff alleges that defendant covered up its earlier improprieties, thus extending the fraud. Thus, as plaintiff would have it, any claim of concealment of earlier fraud would force the work-product privilege to yield because the attorney's conduct is at issue. In other words, the work-product privilege would yield whenever a plaintiff was smart enough to merely allege a "cover-up." But, under this capacious theory, the documents would be "at issue" only if they intended to establish the "cover up." No one would seriously argue that a claim of "cover up" removed the privilege from documents that had nothing to do with the "cover up." I have examined, however, the documents and can find nothing in them to advance in any way plaintiff's claim that SP created these documents to cover up a fraud it initially perpetrated.

Plaintiff further claims a substantial need for the documents otherwise covered by the work-product privilege in order to obtain facts concerning whether (1) SP's actions were fraudulent as opposed to merely negligent; (2) there was a racial motivation to SP's action, suggested by a comment that Ms. Blair "would not oppose us"; and (3) SP's attorneys actually made the repeated promises of representation alleged by plaintiff. *Statement of Points and Authorities in Support of Motion to Compel* at 31.[2] As just noted, however, I have reviewed the documents and have not found a word in them which would indicate a racial motivation or suggest that SP's actions were fraudulent or that its lawyers made the repeated promises of representation alleged by plaintiff. Plaintiff cannot therefore establish a substantial need for the documents she seeks.

[redacted] Moreover, plaintiff is even further from meeting her burden with respect to obtaining opinion work product. Many of the disputed communications were generated in mid-December, after Blair and its newly hired counsel confronted Harvey. The parties were actively pursuing settlement and these documents consist of how to react to Blair's demands, including what lawyer SP should hire and what SP's settlement and litigation posture should be. The documents bearing on settlement are independently privileged under F.R. Evid. 408 and they otherwise perfectly reflect Harvey's strategic thinking and mental processes as he prepared for the lawsuit Blair was just about to file. In the latter respect, they are near perfect opinion work product and Fed. R.Civ.P. 26(b)(3) protects them absolutely.

[redacted] Another eight documents consist of drafts of a response letter to Blair that ulti-

2. Note that in this section of her Statement, plaintiff complains that during the depositions SP's lawyers displayed faulty memories in their depositions. *Statement of P. & A. in Supp. of Mot. to Compel* at 31. Yet she fails to point to a single transcript illustrating such a faulty memory. It is her obligation, however, to establish substantial need and undue hardship and I cannot imagine that she intends for me to read every transcript until I find support for what she is claiming.

mately was never sent. Only three things can happen to a draft that a lawyer prepares in anticipation of litigation or for trial: She sends the draft without change, modifies it and then sends it, or never sends it at all. If she sends the draft without change, the draft is a mere copy of the original and, if one has the original, there is no need to have the draft. If she modifies the draft, comparing the draft with the modified final discloses her mental processes if the changes are more than typographical. If she files the draft and never sends it, the draft discloses her mental processes in the most obvious way. Since drafts can so obviously reflect of a lawyer's mental processes, it is hardly surprising that they have been accorded work-product protection. *Alexander v. Federal Bureau of Investigation,* 198 F.R.D. 306, 312 (D.D.C. 2000); *Blumenthal v. Drudge,* 186 F.R.D. 236, 243 n. 8 (D.D.C.1999).

In this case the many drafts claimed to be work product were obviously intended to depict for their readers SP's versions of the events culminating in the hearing on October 13, 1998. Since they were potentially addressed to Blair or her counsel, they were, as I have held, clearly drafted in anticipation of litigation. They are opinion work product in the sense that knowing how SP intended to respond to Blair's claim discloses the thinking of the lawyers who were charged with responding to her. They also may be considered fact work product in the sense that the drafts discusses the facts as SP saw of events in the period October 9 October 13. Whether opinion or fact, I find nothing in them that contradicts SP's versions of events in that period of time as their attorneys have testified in depositions or as their counsel have represented the facts in this lawsuit itself. The absence of any such contradiction means that Blair has no need for the documents, let alone a substantial one.

### Fraud Exception

■ "Communications otherwise protected by the attorney-client privilege are not pro-

tected if the communications are made in furtherance of a crime, fraud, or other misconduct." *In re Sealed Case,* 754 F.2d 395, 399 (D.C.Cir.1985). This principle applies as well to the work-product privilege. *Id.* at n. 4. A crucial aspect of this exception is that the communication be *in furtherance of* the crime or fraud. Obviously, it is only when a client seeks advice to further a crime or fraud that the societal interest in preventing that crime or fraud trumps the societal interests that underlie the attorney-client and work-product privileges.

The firm has not resisted discovery or claimed any privilege as to its actions prior to October 14, 1998. Since there is no claim of privilege until October 14, the question is the applicability of the fraud exception to the firm's activities from October 14 to the date of the last document. Therefore, it is crucial to differentiate between the firm's alleged behavior prior to withdrawing on October 13 and thereafter. If a fraud was perpetrated on Ms. Blair in the period of October 9– October 13, documents created after October 13 could not possibly further that fraud, for it had already occurred. Thus, post October 13 documents fall within the crime/fraud exception only insofar as they are part of a cover-up. Plaintiff insists that just such a cover-up occurred when the firm, relying to a large extent on Harvey's advice and guidance, conducted its internal review. Under this theory, all the advice Harvey gave to his partners and associates after October 13 was given to conceal the fraudulent abandonment of Blair.

■ One must be careful in analyzing the consequences of the discovery privileges as to this cover-up allegation. If legal advice loses its privileged status merely because the opponent claims that the advice was sought to conceal a fraud, the privilege quickly evaporates. If that were the law, few clients would dare talk to lawyers, because the privilege would disappear the moment their opponent charged a cover-up.[3] Confronted with a

---

**3.** For the crime or fraud exception to apply, it must be an ongoing or future-contemplated action. If the crime or fraud is completed, generally seeking an attorney's advice as to how best to deal with it is privileged, unless a coverup of the completed crime or fraud is contemplated.

Edna Selan Epstein, *The Attorney Client Privilege and the Work–Product Doctrine* at 416 (4th ed.2001).

claim that the advice was sought to further a crime or fraud, this Circuit insists upon a showing of a prima facie case that the client was planning or engaged in a crime or fraud *when the legal advice was sought* before it will invoke the crime/fraud exception, lest the privilege disappear only because a crime or fraud is charged. *In re Sealed Case,* 754 F.2d 395, 399 (D.C.Cir.1985); *See also In re Sealed Case,* 107 F.3d 46, 50 (D.C.Cir.1997) ("But the government had to demonstrate that the Company sought the legal advice with the intent to further its illegal conduct. Showing temporal proximity between the communication and a crime is not enough."). It has to follow that plaintiff must make a prima facie showing of a cover-up before the privilege will yield.

■ Judged by this standard, plaintiff's charge that SP engaged in a scheme to cover up its deception is paper thin. She points to Webster telling Wick that the firm had terminated its relationship with Blair on October 9 and Harvey's and Webster's delivery to Blair's new counsel, Hirsch, a copy of SP's termination letter. She also claims that Webster's statement to Wick was false and Webster should have told Hirsch that SP had "superseded this termination letter by promising to represent Blair at the October 13 hearing." *Reply in Further Support of Plaintiff's Motion to Compel* at 16–17. Blair then reasons:

> "The documents on the Firms' Privilege Log that were generated between October 14th and December 3rd all were generated by participants in the initial fraud against Blair, and are closely related in time to the Firms' misrepresentation to Wick and Hirsch. All of these communications (except for the December 3rd communication) span an approximately two and one-half week interval of time between the Firm's initial fraud and its attempted cover-up scheme. As a result, it reasonably can be inferred from the Firm's continuing fraudulent representations to Wick in November and early December on the same subject as the Firm's initial deception of Blair that the Firm's communications during this interval were sought for the purpose of fur-

thering or concealing the Firm's earlier fraud against Blair."
*Id.* at 17–18.

First, the 1997 *In re Sealed Case* decision instructs that temporal proximity between legal advice and the commission of a crime or fraud is insufficient. *Id.,* at 399. Second, it is a remarkable stretch to portray Harvey as deceiving Hirsch when he delivered the October 9 letter without an explanation of events which occurred after October 9. Hirsch represented Blair and one can be certain Ms. Blair had told him why she believed SP would represent her on October 13. Hirsch had every reason to know that Blair had challenged SP's version of events. How can one lie to someone who knows what your position is and knows that your opponent, Ms. Blair, (Hirsch's client) thinks you are a liar? Dismissing Blair's claim about SP's "deception" of Hirsch and reducing her assertions to their true essentials, Blair's position is that, because Webster lied to Wick on one occasion, everyone at SP had lied to Blair and then concocted a conspiracy to keep her from finding out that they knew they had lied. To construct such a large and nefarious conspiracy on a single alleged misstatement is not to prove prima facie the existence of that conspiracy. It is merely to charge that fraud occurred, and such a charge is insufficient. Blair's "proof" of a conspiracy to cover up SP's lies is not proof at all; it is an ontological leap of faith.

Finally, the real proof is in the pudding. I have examined the documents at issue and cannot find in them a word which advances by an iota the proposition that SP lawyers knew they had lied to Blair and then took steps to conceal these lies. The absence of such an indication, besides negating her conspiracy theory, also means that she cannot have the documents she seeks. Documents said to have furthered a crime or fraud lose their privileged status only if they are in fact directly related to that crime or fraud. *In re Sealed Case,* 676 F.2d at 793. The documents at issue here certainly are not.

### Conflict of Interest Exception

■ Plaintiff further argues that defendant must forfeit the attorney-client and work-product privileges by virtue of its con-

flict of interest in handling the matter internally. In particular, plaintiff identifies Harvey as impermissibly representing SP and himself in the matter following the October 13 hearing.

Rule 1.7(b) of the *Maryland Rules of Professional Conduct* ("Rules")[4] provides in pertinent part:

A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests ...

This rule applies to Harvey who was functioning as counsel to his firm, his "client." When Harvey's advice was sought about how to respond to Blair's allegations against SP, Harvey's role as counsel to his firm placed him in a conflict of interest. His financial interests as a partner of SP would be affected if the former client were to prevail in her claim against the firm. The independence of his advice might therefore be affected by his own financial interest in defeating the former client's claim or potential claim against his firm.

Nevertheless, from the existence of such a conflict, it does not necessarily follow that the firm to whom Harvey gave advice should summarily lose its attorney-client and work-product privileges. While Harvey should have been more sensitive to the conflict between his own interests and the interest of SP, his client, the abrogation of discovery privileges would be unduly punitive. Under this logic, in-house counsel would be absolutely disabled from giving advice to his firm whenever there was a potential claim against it by a former client. The breadth of that approach ignores that a client can waive her attorney's conflict of interest after disclosure of its existence and the possible adverse consequences of it for the lawyer's advice. Rules 1.7(b)(1), (2). Thus, as to SP, the worst Harvey can be accused of is not advising his colleagues of the conflict of interest and its potential adverse consequences before giving them advice as to how to respond to any claim Blair would make against SP. But Harvey's colleagues are lawyers and

surely they are cognizant of the fundamental principle that a client can waive his lawyer's conflict of interest. To grant Blair access to all the documents SP created once it reasonably expected that she would attack it is to grant her a windfall solely because Harvey did not perform the meaningless act of telling his colleagues at SP what they already knew: like his partners, he had a personal financial interest in defeating any monetary claim Blair might make and that interest might affect his judgment. That, in my view, punishes SP out of all proportion to the only ethical dereliction charge that could be leveled against Harvey. It must be borne in mind that when Harvey gives SP general guidance, the attorney-client relationship was between Harvey and SP; the attorney-client relationship between SP and Blair had ended. Since SP was the client in that relationship, I am hard pressed to understand why Blair can complain about Harvey's giving SP advice when she was no longer his or SP's client.

 Unfortunately for SP, Webster's providing information to Wick which Wick used against Blair raises different and more troubling ethical considerations. Under Rule 1.9,

A lawyer who has formerly represented a client in a matter shall not thereafter:

. . .

(b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known.

This obligation was binding on Webster when Wick, representing Blair's opponent, called Webster and sought information contradicting Blair's representations as to what SP had done or not done in the period between October 9 and October 13, 1998. This information was obtained during the professional relationship between SP and Blair, and its disclosure would likely be detrimental to Blair. Clearly, Wick did not call Webster to get information which would *help* Blair. At a minimum, Webster, before answering Wick,

---

4. Because Blair was a Maryland corporation and the legal proceedings concerning the receivership took place in a Maryland court, SP's attorneys were subject to the Maryland Rules of Professional Conduct. *See Maryland Rules,* 8.5.

should have consulted an attorney independent of SP (i.e., *not* Harvey who had a conflict of interest in advising Webster) to seek advice how to respond to Wick. Instead, he proceeded to provide Wick with information that Wick used to accuse SP's former client of perjury. In my view, Webster's failure to secure such advice before providing Wick with information later used against Blair requires the forfeiture by SP of any privilege it could claim as to the work product Webster and SP generated relating to the communications between Wick and Webster.

The attorney-client privilege and the cognate ethical prohibition against revealing a former client's confidences advances the societal interest in effective legal counseling and advocacy by encouraging clients to be as candid as possible with their counsel. *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); *See Jaffee v. Redmond*, 518 U.S. 1, 10, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996). The work product advances the same interest by permitting a lawyer to prepare her case for trial free from unfair intrusion into her mental processes and her consideration of strategy. *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947); *Rockwell Int't Corp. v. U.S. Dep't of Justice*, 235 F.3d 598, 604 (D.C.Cir.2001). When the purposes of these three principles are understood, it becomes clear that to forfeit the protection of the two privileges because of the lawyer's ethical derelictions is especially in order when the client is a law firm.

If a non-attorney client, for example, seeks legal advice from a lawyer not knowing that there is a conflict between the client's interest and the lawyer's, one is hard pressed to understand why the client's expectation that his communications to the lawyer will be confidential should be defeated because of the lawyer's placing herself in a conflict of interest. Similarly, the client's interest in his lawyer's effective advocacy, which animates the work-product privilege, should not be forfeited because the lawyer revealed a former client's confidences while preparing for trial on behalf of another client. In either case, it is perverse to visit the sins of the lawyer on the client's head. Thus, if the defendant in this case was a shipping company, its lawyer's ethical derelictions should have absolutely no effect on the company's right to claim the attorney-client and work-product privileges.

The problem is, however, that defendant is not a shipping company but a law firm. Its members are therefore charged with knowing that there was a specific ethical obligation bearing on what a member or associate of that firm could do or could not say when the firm was invited by its former client's opponent to speak to what occurred between her and the firm. Since Webster did not seek any independent professional guidance as to his ethical responsibilities before he responded to Wick, but instead proceeded to provide information which Wick used against SP's former client, the question becomes whether the attorney-client and work-product privileges should continue to apply as they would in the ordinary course.

I believe they should not. First, privileges, being in derogation of discovering the truth, should be narrowly construed. *In re Sealed Case*, 121 F.3d 729, 748 (D.C.Cir. 1997). More importantly, permitting lawyers to rely on these privileges although they know or ought to know that they are in a perilous ethical position and in need of truly independent advice discourages them from seeking that advice.

Confronted with the possibility that the advice rendered by an attorney may have been motivated by conflict of interest between the attorney's duty to her client and some other interest, two district courts have concluded that the existence of such a conflict may defeat the privilege claim. *In re Sunrise Securities Litigation*, 130 F.R.D. 560, 597 (E.D.Pa.1989); *Valente v. PepsiCo*, 68 F.R.D. 361 (D.Del.1975). These decisions build in turn on the seminal decision in *Garner v. Wolfinbarger*, 430 F.2d 1093, 1100 (5th Cir.1970), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971) which, following Professor Wigmore, held that the attorney-client privilege may have to yield to more important societal interests. I share that view. A law firm's interest in protecting its otherwise privileged communications must yield to the societal interest in assuring that before a lawyer takes action which may jeopardize a former client's interest he seeks

truly independent advice as to his ethical obligations. Loss of the otherwise applicable privileges is a small price for that law firm to pay for failing to seek independent advice when a former client's opponent sought information from it to be used against that former client.

SP, however, tries to rely on Rule 1.6(b)(3) which provides that a lawyer may reveal information relating to representation of a client "... to respond to allegations in any proceedings concerning the lawyer's representation of the client." SP's invocation of Rule 1.6(b)(3) is especially unpersuasive, however, in light of the unconsidered nature of Webster's disclosures. I have reviewed all the documents in this case and I can find absolutely no indication that Webster was aware of that exception and explicitly relied upon it when he spoke to Wick. It must be remembered just how vulnerable Webster was once an angry Ms. Blair called Latham. Ms. Blair was accusing Webster and SP of abandoning her and such a claim, if successful, would expose SP to substantial damages, bringing Webster's professional advancement to a screeching halt. Indeed, Ms. Blair's claim that Webster failed to prepare for the hearing and represent her interests properly could, if accepted, in itself subject Webster to disciplinary action for failing to meet the competency requirement of Rule 1.1. Given Webster's vulnerable position, and the demand for information to be used against his former client, the first thing he should have done upon hearing from Wick was seek independent advice. Accepting SP's post hoc rationalization for his behavior now is the surest way to discourage lawyers from seeking such advice; lawyers would be encouraged to make disclosures to their former client's opponents without getting independent advice as to whether to do it in the hope that, after the disclosure, a second lawyer will come up with an ethical justification that never occurred to them in the first place.

Furthermore, it is anything but clear that Rule 1.6(b)(3) justified what Webster did. The primary purpose of the proceedings that were to take place after Webster spoke to Wick was to resolve the status of Blair's corporation. Whether or not SP had or withdrawn from representing Blair on October 9, 1998 was at best tangential to the actual issues before the Montgomery County Court. SP was not a party to that proceeding and any determination by that court would have had no preclusive effect on SP in a later proceeding. Viewing what was then occurring before the Montgomery County Court as "proceedings concerning the lawyer's representation of the client" is to stretch those words substantially.[5] In any event, whether or not Rule 1.6(b)(3) applied to the proceedings before Montgomery County Court was a complicated ethical issue and provides all the more reason for Webster to seek independent advice before he provided the information to Wick.

Consistent with the logic of the decisions in *Sunrise* and *Valente,* I conclude that the SP's work-product privilege must yield to documents created incident to all communications between Wick and Webster. Two documents in particular fall into this category, Items 3 and 7, consisting of Webster's notes of his telephone discussions with Wick on November 2 and 3. I will therefore order them to be produced to plaintiff.

### Further Analysis of the Specific Documents

Having disposed of plaintiff's broad claims that none of the documents are privileged, I now turn to the documents more specifically, in light of my above conclusions. I am aided by the fact that they fall into several broad categories and I can discuss each category generally.

■ *De Minimis:* I dismiss the claim of privilege as to certain documents on the prin-

---

5. Note that the Comment to Rule 1.6 states that "any such disclosure must be no greater than the lawyer reasonably believes necessary to vindicate innocence, the disclosure should be made in a manner which limits access to the tribunal or other persons having a need to know it, and appropriate protective orders or other arrangements should be sought by the lawyer to the fullest extent practicable." Courts in general have been loathe to read Rule 1.6(b)(3) as a broad justification for disclosure. *Zachair, Ltd. v. Driggs,* 965 F.Supp. 741, 755 (D.Md.1997). *See also First Federal Savings & Loan Ass'n v. Oppenheim, Appel, Dixon & Co.,* 110 F.R.D. 557, 566 (S.D.N.Y.1986) (recognizing the self-defense exception but applying procedural and substantive limits on its applicability).

ciple *"de minimis not curat lex."* I will do so not because I like speaking in Latin but because it trivializes a privilege to apply to words which do not communicate a thought or because these words are so cryptic that they cannot possibly invade what could fairly be described as a thought process. I put in this category a beeper number (# 95), an illegible one word note (# 15) and a five-word note (# 1, SP 000002) expressing the hope that one lawyer (Harvey) will take care of the Blair matter. These documents do not convey what could possibly be described as the mental processes of an attorney working on anticipated litigation and to find them "privileged" is to mock that word.

■ *Billing entries:* The billing entries of an attorney may well reflect what he has done on behalf of his client and directly or indirectly reveal his mental processes. For example, his noting that he spent hours interviewing a witness, followed by his not listing the person as a potential witness, instantly discloses to his opponent that the lawyer thought the witness was either of no help or harmful. The lawyer's opponent, by seeing the billing entry, learns what he never could have learned from the lawyer directly. Yet, asking a lawyer why he interviewed a witness but did not call her is an obvious improper intrusion into the lawyer's mental processes. The work product privilege protects intangible work product as well as what Fed.R.Civ.P. 26(b)(3) calls "documents and tangible things." *See Alexander v. FBI,* 192 F.R.D. 12, 17 (D.D.C.2000); *Athridge v. Aetna Cas. & Sur. Co.,* 184 F.R.D. 200, 209 (D.D.C.1998); *Laxalt v. McClatchy,* 116 F.R.D. 438, 441 (D.Nev.1987); *Delco Wire & Cable, Inc. v. Weinberger,* 109 F.R.D. 680, 691 (E.D.Pa.1986).

The same principle would apply even if the billing entries do not disclose the lawyer's mental processes as dramatically as my example. The fundamental principle animating the Supreme Court's decision in *Hickman* is that the societal interest in competent advocacy in an adversarial judicial system is advanced by permitting lawyers to prepare their cases without unnecessary disclosure to their opponents. It would be hard to imagine a grosser violation of that principle than permitting every lawyer to have for the asking opposing counsel's billing entries which

discloses everything she did on behalf of her client. Indeed, I hope that plaintiff's counsel will remember the Chinese curse: may you get what you want. If plaintiff's counsel can have SP's billing entries to learn what the SP lawyers did to defend themselves SP's lawyers can get plaintiff's counsel's billing entries to see what they did to press plaintiff's claims. I am not about to walk the bench and the bar down that road.

■ With that said, I distinguish billing records before and after SP's withdrawal on October 13, 1998. In the period where SP was representing Blair, any work-product privilege belongs to her, not SP, and I do not understand how SP can assert her privilege against her, particularly when it did or would have used sent her those very billing entries in justification of its bill. Accordingly, I will deny the assertion of the work product privilege for all billing entries and related documents up to October 13, 1998. This means that SP will have to surrender Item 12 but need not surrender Items 21 and 91.

*Rossotti's Notes:* Plaintiff contends that Item 23, a series of notes taken by Rossotti, a member of SP's management committee, is not covered by either the attorney-client or work-product privilege. She claims that these notes were prepared primarily for the ordinary business purpose of assessing Webster's status at the firm, notwithstanding the possibility that SP reasonably anticipated litigation. Rossotti's notes span five different meetings, between October 23 and November 5. Defendant effectively concedes that the notes served a dual purpose of preparing a defense of a potential Blair claim and also evaluating Webster's conduct and status at the firm. *Defendant's Response to Plaintiff's Motion and Supplemental Memorandum* at 7–8.

■ The question, then, is what standard governs the determination of whether documents generated for both litigation and ordinary business purposes are covered by the work-product privilege. Defendant urges me to read *EEOC v. Lutheran Soc. Servs.,* 186 F.3d 959, as establishing a "because of" test in the following sentences of that opinion:

To resolve the parties' competing work product claims, we ask " 'whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.' " *Senate of Puerto Rico v. United States Dep't of Justice*, 823 F.2d 574, 586 n. 42 (D.C.Cir.1987) (quoting 8 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2024 (1970)). In *In re Sealed Case*, we held that for a document to meet this standard, "the lawyer must at least have had a subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable." 146 F.3d at 884.

186 F.3d at 968.

According to defendant, under this test, as long as a document is prepared at least in part because of litigation, then the work-product privilege should attach to it. However, it would be reading quite between the lines to glean this interpretation from *Lutheran's* casual and unexamined use of the words "because of." That Court was actually focusing on the different issue of when a party reasonably anticipates litigation. Indeed, far more prevalent and explicit is this Circuit's and this Court's use of a "primary purpose" test, by which a document's primary purpose must be in preparation of litigation for it to be shielded by the work-product privilege. *In re Sealed Case*, 146 F.3d 881, 884 (D.C.Cir.1998) *Public Citizen, Inc. v. Department of State*, 100 F.Supp.2d 10, 30 (D.D.C.2000); *Amicus Communications, L.P. v. Hewlett–Packard Co., Inc.*, No. 99–0284 HHK/DAR, 1999 WL 33117227, at *2–3 (D.D.C. Dec. 3, 1999); *Janicker v. George Washington University*, 94 F.R.D. 648, 650 (D.D.C.1982).

Proceeding with that primary purpose test, then, I note that P–SP00100–101, two pages of notes from an October 29th, 1998, management committee meeting, conclude with a proposed communication to Blair, suggesting that the purpose of the meeting was to decide how to respond to her claims. Nevertheless, it is not perfectly clear from the notes themselves that the primary purpose for their creation was in anticipation of the litigation Blair might bring.

The other three documents are even more inconclusive for they appear to indicate that the meeting was, at least in significant part, an investigation into Webster's conduct rather than in preparation of a defense to Blair's charges. One document, P–SP000106, consisting of notes taken in a meeting with Paul Mickey, bears the heading "Pfm re: RWK." "RWK" are Webster's initials. Another document, P–SP1000102, begins with a discussion of the Blair matter but then veers off to a discussion of Webster's performance in general. I therefore cannot say conclusively that the primary purpose for the creation of these documents was in anticipation of litigation.

I run into the same ambiguity with respect to the applicability of the attorney-client privilege to the documents in Item 23. There is no doubt that Harvey's communications to the management committee were made in confidence, meeting one of the traditional requirements for the application of this privilege, that the communication contain confidential communications made by the client to the attorney for the purpose of seeking legal advice. *Tax Analysts v. Internal Revenue Service*, 117 F.3d 607, 617 (D.C.Cir.1997).[6] But there is much uncertainty on the issue of whether Harvey's communications to the management committee consisted of "legal advice or assistance." In

---

**6.** As I have explained, Harvey was functioning as counsel to his firm in its organizational capacity as an entity, in a relationship identical for legal purposes to the relationship between corporate counsel and the corporation that employs her. For clarification, it helps to break down the various communications sequentially. First, Harvey conducted an investigation, speaking with various firm members, including Webster, Janney, Hatcher, and Latham. Harvey then compiled this information and reported it to the management committee, i.e., his client. According to *Upjohn v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), the first set of communications, made to Harvey during his investigation, are presumed to be in confidence. Likewise, Harvey's repackaging of this information to the management committee should also be deemed in confidence, since it incorporated confidential information imparted to him during his investigation.

this regard, I apply a very similar "primary purpose" test as I used for the work-product privilege. If the primary purpose of the October 29, 1998 meeting's was to evaluate Blair's potential claim, the attorney-client privilege attaches to Harvey's explanation of what he had learned from the partners and associates of SP to the management committee and any guidance he provided insofar as his explanation tended to disclose what Harvey learned in confidence from the SP partners and associates. On the other hand, if all the meetings in Item 23 primarily concerned Webster's status at the firm, then Harvey's assistance could not fairly be described as legal. Instead, the management committee would be considering a management personnel decision, as the purpose of the meeting would be an assessment of whether Webster should continue with the firm.

Therefore, the respective primary purposes of each of these five meetings will be dispositive of both the work-product and the attorney-client privileges. The information provided to me is too inconclusive and a factual hearing is in order. At that hearing, SP, claiming the privilege, will have the burden of establishing its existence.

*Remaining documents.* All the remaining documents were clearly created by SP's members in anticipation of litigation. For example, they represent the collection of facts as what happened and, on occasion, speak to an appropriate response by SP to Blair's demands and claims. They are therefore both fact and opinion work product and fall clearly within the work-product privilege. As I have ruled, plaintiff cannot show a substantial need for them and the legitimate privilege claimed does not yield.

*Depositions.* I have also reviewed the portions of the depositions during which SP claimed a privilege and my rulings as to SP's objections are consistent with my ruling as to the documents. Specifically considering the portions of the depositions which appear at pages 41–45 of the Statement of Points and Authorities in Support of Motion to Compel, I rule as follows.

**Testimony of John Bryson.** Testimony about discussions between Bryson and the other SP lawyers as to the "Blair matter" would tend to disclose work product. I will however require Bryson to testify as to what Latham said Ms. Blair said to Latham on October 14, 1997. It appears to me that SP cannot be said to be anticipating litigation until Latham speaks to Ms. Blair after the October 13, 1998 hearing. Bryson's potential testimony as to why he feared that litigation would result is of academic interest in light of my ruling that SP reasonably anticipated litigation after Ms. Blair's call to Latham. Objection to it is therefore sustained.

**Testimony of Michael Hatcher.** The one objection made on the basis of privilege was to the source of information for documents which I have held to be privileged in whole or in part. I believe that disclosing those sources would also tend to disclose the work product and I sustain the objection.

**Testimony of Phillip Harvey.** Again, I will order Harvey to say what Latham said Ms. Blair had said to Latham. Until Latham speaks, Harvey and SP cannot anticipate litigation. The other question—whether Harvey wondered whether Webster had complied with his voice mail instructions of October 9—is clearly work product. Because I have ruled that SP cannot assert the attorney-client and work-product privileges as to the communications between Wick and Webster which lead to Webster's delivering the October 9, 1998 letter to Wick, Harvey must answer all questions concerning all communications within the firm which occurred after Wick first called Webster and which dealt with SP's providing Wick with information and document[s] and with the delivery of document[s] to Wick by any person affiliated with SP. The objection to such questions during Harvey's deposition is overruled.

An Order accompanies this memorandum.

### ORDER

In accordance with the Memorandum Opinion issued herein, it is **ORDERED THAT** Plaintiff's Motion to Compel [# 29] is **DENIED IN PART** and **GRANTED IN PART** and **IT IS FURTHER ORDERED THAT**

1. Defendant shall provide plaintiff with copies of items # 95, # 15 and of the

five word note that appears in #1 at SP 000002.

2. There will be an evidentiary hearing concerning item #23. Counsel should consult with each other and then advice the Court of convenient dates and times. The hearing should take about 3 hours.

3. Counsel will meet and confer in an attempt to arrive at an agreement as to the resumption of any depositions to permit the witnesses to answer questions I have indicated are proper or whether they can eliminate the need for any such resumption by stipulation. If they cannot agree, counsel for plaintiff shall file a praecipe explaining their disagreement and I will resolve it.